*416
 
 ADKINS, Judge.
 

 At stake in this case are the interests of two parents and their severely disabled four year old in continuing their parent-child relationship, even though the child may never be able to live with either parent. Mr. “A” and Ms. “A” appeal from a decision to terminate their parental rights in order to make Victor A eligible for adoption.
 

 We shall vacate the judgment and remand to the Circuit Court for Prince George’s County, because it failed to make required factual findings or to explain why terminating the As’ parental rights is in Victor’s best interests. On remand, the court and the Prince George’s Department of Social Services (DSS) must consider whether this is one of the rare cases in which a foster care permanency plan is in the child’s best interest.
 

 FACTS AND LEGAL PROCEEDINGS Victor
 

 Victor A was born on March 26, 2000 to Ms. A and Mr. A.
 
 [1]
 
 He tested positive for cocaine and amphetamines at birth and was diagnosed with severe mental and physical disabilities, including cerebral palsy. His diagnoses include Mental Retardation, Dysphagia, Myopia, Reflux, Global Developmental Impairment Microcephaly, Encephalopathy, and Failure to Thrive. Victor cannot speak or walk, nor is he expected to be able to do so.
 

 Victor is unable to control his head or any of his extremities, because he is severely spastic and cannot sit up unaided. He is given Valium to help this, as well as other medications to decrease muscle spasms, drug treatments through a nebulizer four times daily, and nose spray to help keep his lungs and breathing passages open. He has several contraptions, including a tumble form, a stander, and a straight sitter, which are
 
 *417
 
 used to stretch his muscles while keeping him safe and upright.
 

 Victor is unable to hold anything for very long. He uses a wheelchair, braces to keep his legs straight, and a wedge to lie on. He is nearsighted, despite “lazy eye” surgery. He wears glasses but no one knows how much they really help his sight. Victor also requires medicines to help him void his bowels; he was not toilet trained at the time of these termination of parental rights (TPR) proceedings, needing to be changed every two or three hours.
 

 In order to prevent deformities that can result from the contraction of muscles and to help improve motor skills, Victor receives physical and occupational therapy, as well as speech therapy. Through treatments, it is hoped that Victor will be able to grasp objects, sit up on his own, and possibly even learn to use a message board to communicate.
 

 Because Victor has a swallowing disorder, he can be fed only through a gastronomy tube (G tube). His accompanying reflux disorder is managed daily by three different medications and gradual feeding using his G tube.
 

 Over a 24 hour period, Victor gets medication evexy hour or two. He sleeps in a hospital cxib with side rails and suffers from sleep apnea; therefore he has to be watched through the night. Victor sees numerous doctors including a physical medicine doctor, a pulmonologist, an ophthomologist, a neurologist, a gastrologist, a pediatrician, and an orthopedist as part of his care. Victor’s foster mother, Jackie Plumley, said that Victor “pretty much has a doctor for every system he has.”
 

 Since he began residing at Plumley’s home in April 2001, Victor has gained weight and generally seems to be a happy, well-mannered child. Victor is aware of his surroundings and is able to communicate on some level. He shows his pleasure by smiling or giggling when he is happy or crying and grimacing when he is upset. He can select between two toys or show his like or dislike of a television program. He also no longer cries when his caretaker leaves him bxiefly, if she explains to him that she will return in a moment.
 

 
 *418
 
 Victor responds to people he knows, including his parents and his foster mother. Both Mr. A and Ms. A have court-approved visitation with Victor. Victor recognizes each parent and expresses happiness when they arrive. He enjoys their visits. All agree that both parents love Victor and express that love in these visits.
 

 Mr. A’s History And Interactions With Victor
 

 Victor was discharged from the hospital in July 2000, to the care of Sonya Harris, one of Ms. A’s sisters. Neither Ms. A nor Mr. A was able to take Victor because Ms. A was an active substance abuser and Mr. A was being assessed for substance abuse as well. Mr. A agreed to be tested in order to prove that he was not taking drugs. The results were negative. There has never been any indication of substance abuse by Mr. A.
 

 In late October, however, Victor was moved into therapeutic foster care with Mary Guding because Ms. A alleged that Harris’ fifteen-year-old son had sexually abused Victor. The DSS did not believe that Mr. and Ms. A were ready to assume custody and care of Victor. The abuse allegations were later ruled out and Harris was offered the opportunity to resume custody of Victor. She declined because she was angry with Ms. A.
 

 While Victor was in Guding’s foster care, Mr. A had unsupervised visitation with Victor from Wednesday through Saturday or Sunday of every week. Mr. A was awarded full custody of Victor in January 2001. The court authorized only supervised visits for Ms. A, however, mostly due to concern about her mental health.
 

 Mr. A’s custody was rescinded three months later, because Victor’s medical needs were not being met and the DSS suspected that Victor had been left in Ms. A’s unsupervised care, in violation of the court order granting Mr. A custody. Mr. A had been relying on relatives of Ms. A for Victor’s care during the day. These arrangements changed on a daily basis. Victor’s therapists had great difficulty locating Victor
 
 *419
 
 for his treatments, frequently having to call several homes to find out where Victor was that day. As a result, Victor often did not receive necessary in-home services.
 

 When Victor was returned to therapeutic foster care in April, he was adjudicated a child in need of assistance (CINA). Victor was placed with Jackie Plumley, who continued to care for him through the time of the TPR proceedings.
 

 Plumley described Victor’s emaciated and feverish condition when he arrived:
 

 He was a mess. He was crying hysterically nonstop not only the first few hours but almost for the first week. His body itself was—he was quite emaciated. He was very light in weight. He weighed 17 pounds, I believe, 17 something. His skin itself had a big rash on it around his neck from drooling, I’m sure, because it was an eczema-type thing. He had a quarter size or larger ulceration on the inside of his lip, bottom lip where he was just biting, and I had never seen anything quite so bad, actually. It had to be very painful. He was in dire need of medical attention.
 

 Plumley re-enrolled Victor in the Rare and Expensive Medical Program (REM) to obtain the equipment he needed because those services had lapsed. She also had his prescriptions refilled.
 

 After Victor was returned to foster care, Mr. A resided in the basement of someone else’s home, where he could not take Victor on a permanent basis. Mr. A agreed to find other housing and to arrange for appropriate daycare for Victor. Although he had the financial means to secure suitable housing, he was reluctant to undertake that expense until he could be sure that Victor would live with him.
 

 Mr. A signed service agreements on June 6 and August 26, 2001, in which he promised to take parenting classes for parents of children with special needs. DSS caseworkers referred Mr. A to three programs and wrote to the one that he selected, advising of Victor’s condition and Mr. A’s need for training. Mr. A did attend some of Victor’s medical appoint
 
 *420
 
 ments, as well as educational meetings concerning children with special needs.
 

 Mr. A continued to visit Victor after he returned to foster care at the Plumleys. According to Plumley, Mr. A was satisfied with that arrangement. He initially told her that he did not think he could take care of Victor because, at least in his native Nigeria, “that’s the mother’s job.” Plumley told him about the services that would be available to him and told him about a conference for children with cerebral palsy, which he attended. Nevertheless, Mr. A continued to observe that “[i]t’s my culture that the woman takes care of the children.” Mr. A later disputed that he said caring for children is the woman’s job.
 

 Although Mr. A and Victor initially had unsupervised overnight visits away from the Plumleys, those were reduced to day visits because Mr. A did not give Victor the right amount of medication.
 
 [2]
 
 Mr. A’s visits were rescheduled from ten in the morning until six at night so that Victor would need no food or medication during that time period.
 

 According to Plumley, since Victor was placed in her care and been placed on a very regular regime of medication, therapy, and sustenance, he has become
 

 a delightful young man. His personality has blossomed. He’s less irritable. Physically the things that were wrong are gone, the rashy skin. He’s well hydrated now. The ulcerations that he had in his mouth healed up and they’re not present. When Victor first came to me he was so irritable that I almost didn’t keep him.
 

 Ms. A’s History, Diagnoses, And Interaction With Victor
 

 At the time of Victor’s birth and hospital release, Ms. A was an active cocaine and alcohol abuser who was not undergoing
 
 *421
 
 treatment. Ms. A was referred to the Treatment of Mothers of Addicted Newborns (TMAN) program
 
 [3]
 
 while Victor was still hospitalized following his birth.
 

 TMAN then referred Ms. A to the Children and Parents Program (CAP), which offers outpatient substance abuse and mental health therapies. Ms. A began treatment there on June 2, 2000. She was expected to submit to urinalyses and go to treatment sessions three days a week. Ms. A attended sessions on June 5 and 7, but did not come again until June 30. Her first urinalysis tested positive for cocaine and two other tests were positive for alcohol.
 

 TMAN referred Victor to the DSS because Ms. A had missed so many sessions. Ms. A claimed that she had been unable to attend the CAP sessions because she was visiting the hospital for instruction on Victor’s care. The hospital denied that she received such instruction.
 

 Ms. A eventually returned to the CAP program, which she attended on a fairly regular basis, though she did lapse occasionally. Ms. A. was allowed supervised visits at first, and later unsupervised visits with Victor. By October 2000, Mr. A and Ms. A were allowed to have extended visits with Victor.
 

 Kathleen Schooley, Victor’s DSS caseworker, related her concerns about Ms. A’s handling of Victor during her visits. She stated that Ms. A did not support his head, which he cannot support himself, letting it “flop.” She also “scrunched up” his legs, an action that exacerbates the constriction in his chest and stomach, and thus puts pressure on his abdominal area. Nurse Karole Ozkirbas reported that, although Ms. A had been taught the proper way to hold Victor, she often handled him in an unsafe manner. Jackie Plumley testified that Victor had vomited on occasion after visits with Ms. A, possibly due to her improper handling of him.
 

 
 *422
 
 In order to gain custody of Victor, Ms. A was required to have psychological, sociological, and psychiatric evaluations; to complete parenting skills classes for the parents of special needs children; to engage in mental health therapy; and to participate in substance abuse treatment.
 
 [4]
 
 Ms. A was discharged from the CAP program on May 2, 2001, because she moved to Washington, D.C. Her CAP therapist, however, felt she required further treatment. She referred Ms. A to another mental health treatment program in the District of Columbia. Ms. A did attend these programs as well as a United Cerebral Palsy parenting class.
 

 Ms. A was examined by Jamal Lewis, Ph.D. over two sessions on August 19 and October 5, 2002. Although the juvenile court had released Ms. A from court-ordered drug testing
 
 30
 
 days earlier, she reported to Lewis that she was living in a “crack” house, had consumed alcohol in the preceding thirty days, and had tested positive for cocaine recently.
 

 
 *423
 
 Dr. Lewis recommended substance abuse treatment and individual mental health counseling. A DSS caseworker tried to obtain medical assistance for Ms. A in the District of Columbia, where Ms. A was residing at the time, so that her therapy would be paid for without having to travel to Maryland for treatment. The caseworker was not able to ascertain a home address for Ms. A, and Ms. A did not provide one. For that reason, the caseworker could not secure medical assistance for Ms. A from October 2002, when Dr. Lewis made the recommendation, to January 2003, when Ms. A voluntarily entered Bethany Women’s Center in N Street Village.
 

 From January 2003 until the TPR hearing, Ms. A was in the Bethany Women’s Center program, residing at the Luther Place Night Shelter. At the shelter, she is not permitted to have any children living with her, though she had tried to obtain a placement in transitional housing, but found it would be possible only if Victor was in her custody. She had to remain on the campus of the shelter all the time for the first ninety days she was there, except when she had medical appointments or had to attend mandatory AA or NA meetings. She had random urinalyses approximately once a month. At the time of the TPR hearing, her results had all been negative.
 

 Ms. A also received therapy from Community Connections, a psychiatric day program providing mental health services and therapeutic case management. Ms. A attends both group therapy and individual therapy sessions covering issues of mental health, substance abuse, and personal welfare in general, as well as anger management, problem solving, and coping.
 

 Ms. A also was evaluated by David Paul Faygo, Ph.D. on May 28 and June 4, 2003, in accordance with a court order. Dr. Faygo testified at the TPR hearing that he reviewed a great deal of past information, previous medical records, court reports, and correspondence before the evaluation. After a two hour clinical interview and psychological testing, he concluded that she has an Axis 1 diagnosis of delusional disorder, which he thought was part of a Type II Bipolar Disorder, a major mood disorder characterized by states of high energy,
 
 *424
 
 sleeplessness, delusions, and actions that reflect impaired judgment and decision-making. He also determined that she has an Axis 2 diagnosis of narcissistic personality disorder with paranoid schizoidal and obsessive compulsive traits, which are common in persons with Type II Bipolar Disorder.
 

 Dr. Faygo recounted Ms. A’s difficult history arising from her mother’s mental illness, depression, and nervous breakdowns, and from sexual abuse she experienced as a child. He diagnosed her with polysubstance dependence in early partial remission, meaning that she was in a treatment program and had been substance-free from four to six months. He explained that, at this early stage of recovery, she was at risk of relapsing.
 

 In Faygo’s professional experience, a woman with Ms. A’s diagnoses and in her situation could care for a child, but it would affect her ability to function well. He felt that, even though Ms. A was trying to be able to take care of her child and to comply with the service agreement requirements, Victor’s enormous needs, both developmental and medical, are enough to overwhelm two parents, let alone one. He testified that he “could not see how [Ms. A] would ever be capable of providing for his care.”
 

 Change In Permanency Plan
 

 On May 28, 2002, 13% months after Victor was placed in the Plumleys’ care, the primary permanency plan for Victor was changed from reunification with Mr. A to adoption. On December 12, at a review and permanency planning hearing, the court granted the DSS limited guardianship; ordered Ms. A to continue drug testing and counseling for her substance abuse and mental health needs; and ordered Mr. A to attend training for parents of children with cerebral palsy, to secure housing suitable for Victor, and to obtain an attorney. It reduced both parents’ visits to once a month. The day before, the DSS had petitioned the court for a termination of parental rights with the right to consent to adoption.
 

 
 *425
 
 Joan Terry, Victor’s caseworker at the time, testified that one reason for the change in the permanency plan was that she saw no movement on Mr. A’s part. She only wanted to reunify Victor with his father, due to Ms. A’s substance abuse, mental health problems, and housing situation. Terry asked for the change because
 

 [i]t had been at least 15 months and reunification had not occurred, and that’s one of the policies that all of us in foster care know about. Not only that, there was no movement on Mr. A’s part and I could not sit on this case and just hold it.
 

 When asked, “did you consider leaving Victor with Mrs. Plumley and just letting [the parents] visit?” Terry explained:
 

 No.... There has to be some movement on these cases. That’s part of policy. I mean, somebody has to do something. It has to move toward a goal of stabilization for the child, and if the child can be adopted by a family because their own family isn’t doing anything and are not capable then that’s the way it should be. So why would I just leave a kid in a foster home....
 

 Terry also ruled out a permanent foster care placement because Plumley planned to retire in two to three years. Kathleen Schooley, the caseworker who succeeded Terry, confirmed that a plan to leave Victor in long-term foster care while allowing the A’s to continue visits “was ruled out.”
 

 The Decision
 

 At the end of the TPR hearing, the circuit court found that “Victor ... has an awareness that his parents are special people, and he reacts to them as well as his foster parents, whom he reacts to as special people.” Given Ms. A’s history of mental illness and substance abuse, however, “the return of Victor, Jr., to his mom does pose an unacceptable risk to [his] future safety[.]” In contrast, the court stated that it could not make a similar finding with respect to Mr. A.
 

 
 *426
 
 Although the court was satisfied with Mr. A’s parent training efforts, it found Mr. A’s failure to find housing appropriate for Victor troubling. The court discounted Mr. A’s assurances that, if Victor were to be returned to his care, he would secure suitable housing, finding that “Mr. A has not really put himself in a better position to deal with Victor, Junior’s problems, that there is little likelihood that those conditions will be remedied at an early date so the child can indeed return to the natural parent in the immediate future.”
 

 The court determined that Victor was receiving better care through the foster care placement arranged by the DSS than his father could give him. At the end of the August 14 hearing, however, it reserved decision on “whether it is in the best interests to terminate his parents’ rights[.]” In a September 29, 2003 written order, the court “eonclude[d] that it is in the best interests of Victor [A] for termination of his natural parents rights[.]” It granted the DSS’s petition for guardianship -with the right to consent to adoption and/or long term care, but also
 

 [found] that until such time as the “Department” identifies such adoptive or long-term resource, that it is in the best interests of Victor [A] to continue visitation with [Ms. A] and [Mr. A] under the supervision of the “Department.”
 

 Ms. A and Mr. A filed this timely appeal.
 

 DISCUSSION
 

 Termination Of Parental Rights
 

 The proper starting point for legal analysis when the State involves itself in family relations is the fundamental constitutional rights of a parent. Certain fundamental rights are protected under the U.S. Constitution, and among those rights are a parent’s Fourteenth Amendment liberty interest in raising his or her children as he or she sees fit, without undue interference by the State.
 

 In re Yve S.,
 
 373 Md. 551, 565, 819 A.2d 1030 (2003). The right to rear one’s own child is a basic civil right that cannot
 
 *427
 
 be taken away without clear justification, under both federal and Maryland law.
 
 See id.
 
 at 566-67, 819 A.2d 1030.
 

 But “[t]he rights of a parent in the raising of his or her children ... are not absolute.”
 
 Id.
 
 at 568, 819 A.2d 1030. In some circumstances, “application of an absolute right of the parent would fail to produce a just result.”
 
 Id.
 
 “[WJhen clear and convincing evidence exists that the child’s best interests are served by termination^] a parent’s constitutional right to parent his child [may] be permanently foreclosed.”
 
 In re Adoption/Guardianship Nos. J9610436 and J9711031,
 
 368 Md. 666, 692-93, 796 A.2d 778 (2002).
 

 A court considering whether to terminate parental rights must give “primary consideration to the safety and health of the child[.]” Md.Code (1984, 1999 RepLVol., 2003 Cum.Supp.), § 5-313(c)(l) of the Family Law Article (FL). “[I]n almost all cases, it is in the best interests of the child to have reasonable maximum opportunity to develop a close and loving relationship with each parent.”
 
 In re Adoption/Guardianship J9610436,
 
 368 Md. at 670, 796 A.2d 778. For that reason,
 

 [t]he best interests of the child standard embraces a strong presumption that the child’s best interests are served by maintaining parental rights. If it were otherwise, the most disadvantaged of our adult citizens always would be at greater risk of losing custody of their children than those more fortunate. Those of our citizens coping with emotional or mental difficulties could be faced with such discrimination.
 

 In re Yve S.,
 
 373 Md. at 571, 819 A.2d 1030 (citations omitted).
 

 For children in foster care, both the local social services department and the court must consider whether the individual child’s health and safety is being compromised by the long term effects of foster care. Federal and state governments have recognized that long periods of foster care may harm the very children whom the foster care system is designed to protect. They have undertaken reasonable steps to prevent childhoods spent in “foster care drift”—the legal, emotional,
 
 *428
 
 and physical limbo of temporary housing with temporary care givers. The federal “Adoption Assistance and Child Welfare Act of 1980,”
 
 codified at
 
 42 U.S.C. §§ 670-79, was enacted to redress the growing problem of children spending substantial amounts of their childhood in foster homes.
 
 See id.
 
 at 572, 819 A.2d 1030;
 
 In re Adoption/Guardianship No. 10941,
 
 335 Md. 99, 104, 642 A.2d 201 (1994).
 

 To comply with federal mandates in that act, the Maryland General Assembly ... enacted legislation .... for those children committed to a local department of social services ... requiring] [the department] to develop and implement a permanency plan that is in the best interests of the child. F.L. § 5-525.
 

 In developing the permanency plan, the department is required to consider a statutory hierarchy of placement options in descending order of priority. F.L. § 5-525(c). First and foremost, the department must consider returning the child to the child’s natural parents or guardians. F.L. § 5-525(c)(l). If reunification with the biological parents is not possible, the department must consider placing the child with relatives to whom adoption, guardianship, or care and custody, in descending order of priority, are planned to be granted. F.L. § 5-525(c)(2). If placement with relatives is not possible, then the department must consider adoption by a current foster parent or other approved adoptive family. F.L. § 5-525(e)(2)(3)(l). Only in exceptional situations as defined by rule or regulation is a child to be placed in long term foster care. F.L. § 5-525.
 

 If it is determined that reunification is not possible and that adoption is in the child’s best interests, .... the department is required to petition the circuit court for guardianship pursuant to F.L. § 5-313. If the circuit court finds by clear and convincing evidence, after considering the statutorily enumerated factors, that it is in the best interest of a child previously adjudicated a CINA for parental rights to be terminated, the circuit court has authority to grant the department’s petition for guardianship. Such award carries
 
 *429
 
 with it the right for the department to consent to the adoption of the child. F.L. §§ 5-311 and 5—317(f).
 

 The overriding theme of both the federal and state legislation is that a child should have permanency in his or her life. The valid premise is that it is in a child’s best interest to be placed in a permanent home and to spend as little time as possible in foster care. Thus, Title 5 of the Family Law Article seeks to prevent the need for removal of a child from its home, to return a child to its home when possible, and where returning home is not possible, to place the child in another permanent placement that has legal status.
 

 In re Adoption/Guardianship 10941,
 
 335 Md. at 105-06, 642 A.2d 201 (emphasis added);
 
 see In re Yve S.,
 
 373 Md. at 575-76, 819 A.2d 1030.
 

 Foster Children With Special Needs
 

 Together, sections 5-313, 5-525, and 5-525.1 of the Family Law Article, along with Md.Code (1974, 2002 RepLVol., 2003 Cum.Supp.), section 3-283 of the Courts and Judicial Proceedings Article (CJ), comprehensively govern termination of the rights of parents whose children are in foster care.
 
 [5]
 
 Section 5-525(b) requires the DSS to “develop and implement a permanency plan that is in the best interests of the child” at the same time that it is “providing] time-limited family reunification services to a child placed in an out-of-home placement and to the parents ... of the child, in order to facilitate the child’s safe and appropriate reunification within a timely manner!.]” The DSS may make “[reasonable efforts to place a child for adoption or with a legal guardian ... concurrently with ... reasonable efforts” to reunify and preserve the family. FL § 5-525(d)(3).
 

 
 *430
 
 In creating and structuring the foster care system, the General Assembly recognized that children with significant physical or mental health challenges are likely to have special needs within the system. For example, to ensure that families are not separated solely as a result of the financial burdens arising from a child’s special needs, the General Assembly directed that
 

 [a] child may not be committed to the custody or guardianship of a local department and placed in an out-of-home placement solely because the child’s parent or guardian lacks shelter or solely because the child’s parents are financially unable to provide treatment or care for a child with a developmental disability or mental illness.
 

 FL § 5—525(c)(2)(i). Nor may a child with special needs be placed into foster care for the sole purpose of “obtaining] treatment or care related to the child’s disability that the parent is unable to provide.” FL § 5-525(a)(2)(i).
 

 In light of the different circumstances frequently presented by developmentally disabled and other special needs children in the foster care system, the General Assembly also established exceptions to certain time frames designed to prevent children from languishing in foster care limbo. There are a host of legislatively mandated deadlines designed to reduce the amount of time that a child spends in foster care.
 
 [6]
 
 And the declared legislative policy is that “[ejvery reasonable effort shall be made to effectuate a permanent placement for the child within 24 months after the date of initial placement.” CJ § 3-823(h)(3).
 

 In most cases, if the DSS concludes that adoption is in the best interest of a child who has been in foster care for 15 of the last 22 months, termination of parental rights proceedings must be initiated within 120 days.
 
 See
 
 FL § 5-525.1(a)-(b).
 
 *431
 
 Concurrent with the termination proceedings, “the local department shall identify, recruit, process, and seek to approve a qualified family for adoption, guardianship, or other permanent placement.” FL § 5-525.1(c).
 

 But the General Assembly also recognized that the need for permanency reflected in these time frames may be different for foster children with special developmental, physical, or mental health needs. It explicitly provided that a child
 

 may remain in an out-of-home placement under a voluntary placement agreement for more than 180 days if the child’s disability necessitates care or treatment in the out-of-home placement and a juvenile court makes a finding that continuation of the placement is in the best interests of the child.
 

 FL § 5—525(a)(2)(ii). It also made clear that
 

 [a] local department is not required to file a petition [for termination of parental rights] ... if ... the local department has documented in the case plan ... a compelling reason why termination of parental rights would not be in the child’s best interests; or ... the local department has not provided services to the family consistent with the time period in the local department’s case plan that the local department considers necessary for the safe return of the child to the child’s home.
 

 FL § 5—525.1(b)(3).
 
 See also
 
 FL § 5-525.1(d)(“This section may not be construed to ... require a local department to file a petition”).
 

 One legislatively approved alternative to adoption and its attendant termination of parental rights is foster care. FL section 5-525(e)(2) directs local departments to “consider ... permanency plans [] in [a] descending order of priority[,]” with adoption generally favored over foster care plans. The General Assembly nevertheless left open the possibility that the local department might determine that the lower priority option of “permanent foster care with a specific caregiver” or “long term foster care” would be in a child’s best interest. CJ section 3-823 requires courts to follow the same priority, but explicitly recognizes that a court may decide that permanent
 
 *432
 
 or long term foster care is appropriate for children with special needs:
 

 (e)
 
 Determinations to be made at
 
 hearing.—At a permanency planning hearing, the court shall ... (1) Determine the child’s permanency plan, which may be:
 

 (i) Reunification with the parent or guardian;
 

 (ii) Placement with a relative for:
 

 1. Adoption; or
 

 2. Custody and guardianship;
 

 (iii) Adoption by a nonrelative;
 

 (iv) Guardianship by a nonrelative;
 

 (v) Continuation in a specified placement on a permanent basis because of the child’s special needs or circumstances;
 

 (vi) Continuation in placement for a specified period because of the child’s special needs or circumstances; or
 

 (vii) Independent living....
 

 (f)
 
 Continuation of placement for a specifíed
 
 period.— The court may not order a child to be continued in a placement under subsection (e)(l)(v) or (vi) of this section unless the court finds that the person or agency to which the child is committed has documented a compelling reason for determining that it would not be in the best interest of the child to:
 

 (1) Return home;
 

 (2) Be referred for termination of parental rights; or
 

 (3) Be placed for adoption or guardianship with a specified and appropriate relative or legal guardian willing to care for the child. (Emphasis added.)
 

 The As’ Challenges To Termination
 

 We use three different standards in reviewing a circuit court’s decision to terminate parental rights. First,
 

 [w]hen the appellate court scrutinizes factual findings, the clearly erroneous standard of Rule [8—131(c) ] applies. [Second,] if it appears that the [court] erred as to matters of
 
 *433
 
 law, further proceedings in the trial court will ordinarily be required unless the error is determined to be harmless. Finally, when the appellate court views the ultimate conclusion of the [court] founded upon sound legal principles and based upon factual findings that are not clearly erroneous, the [court’s] decision should be disturbed only if there has been a clear abuse of discretion.
 

 Davis v. Davis,
 
 280 Md. 119, 126, 372 A.2d 231,
 
 cert. denied,
 
 434 U.S. 939, 98 S.Ct. 430, 54 L.Ed.2d 299 (1977);
 
 see In re Yve S.,
 
 373 Md. at 586, 819 A.2d 1030.
 

 In this appeal, the As ask us to hold that the DSS and the circuit court failed to establish by clear and convincing evidence that termination of their parental rights was in Victor’s best interest. Observing that “Victor is no ordinary child,” Mr. A and Ms. A argue that “it would be in Victor’s best interest to leave him in foster care with visitations with his parents.” In their view, Victor has less need for quick resolution of his permanent legal status because “[h]is intelligence and awareness quotient [is] much, much less than the average child.” Moreover, as the circuit court acknowledged, Victor benefits from “[c]ontinued contact with ... natural parents who love him,” while he is in therapeutic foster care. Instead of terminating their parental rights, they contend, Victor is best served by a permanent or long term foster care arrangement. This arrangement is preferable to adoption and termination because it satisfies Victor’s needs for stability and a loving relationship with his parents without depriving them of their constitutionally protected rights.
 

 Both parents also challenge the court’s conclusion that neither will be able to care for Victor at their own home within a reasonable period of time. Mr. A contends that “[i]t was never shown that [he] could not care for Victor if he had been given the resources afforded to the Plumleys.” Only after Mr. A is given the 16 hour a day nursing care and REM subsidies that Victor receives at the Plumleys can it be fairly determined that Victor could not returned to Mr. A’s care. In his view, the court’s reliance on Mr. A’s failure to secure housing that would be suitable for Victor “in the hopes that the court
 
 *434
 
 would award him custody” was an improper penalty for his understandable reluctance to undertake housing expenses that he will need only if the court agrees to let Victor live with him.
 

 As for Ms. A, she asserts that termination was not warranted given her great love for Victor, her progress in overcoming her drug abuse and managing her bipolar disorder, and her efforts to prepare herself to remain an integral part of Victor’s life. She argues that the circuit court “was simply wrong when it found that her mental status and past drug abuse posed an ‘unacceptable risk’ to Victor’s future safety.”
 

 The DSS and counsel for Victor disagree that a permanent or long term foster care plan would adequately serve Victor. The DSS argues that such an arrangement
 

 would fly in the face of clearly articulated public policy based soundly on the real needs of children. The guardianship and adoption laws are based on the General Assembly’s recognition of the reality that children need stable, permanent homes and that all foster care is inherently unstable____ Like any other child—and perhaps more than some—Victor needs the security that only a truly permanent home can give.
 

 Victor’s current placement does not offer him that security and permanency. His foster mother plans to retire in two or three years, which will necessitate Victor’s removal from her care. Thus, as for any child, only adoption provides the assurance that Victor will be in a stable home and will not have to readjust to a new environment, possibly several times. Only termination of parental rights offers Victor the opportunity that any child in foster care should have when his parents cannot care for him—the opportunity to find a permanent, stable home through adoption. (Emphasis added.)
 

 In DSS’s view, the trial court correctly “determined ... that Mr. A has failed to make even the basic adjustment in his circumstances of finding a suitable home for himself and Victor and that his failure arose from nothing but a lack of initiative.” They point also to Ms. A’s active history of
 
 *435
 
 substance abuse and mental illness, and her therapist’s conclusion that, even with sobriety, medication, and therapy, she is not likely to ever be able to successfully manage Victor’s demanding health needs.
 

 We agree with Mr. A and Ms. A that neither the circuit court nor the DSS adequately explained why it is in Victor’s best interest to terminate their parental rights. We decline, however, the As’ invitation to substitute our judgment for that of the circuit court on the ultimate issue of whether to terminate their parental rights. Instead, we shall vacate the termination order and remand for the court to make necessary factual findings and to articulate the reasons that termination is in Victor’s best interests.
 

 Factors To Be Considered In Deciding Whether To Terminate Parental Rights Of Child In Foster Care
 

 Before deciding to seek adoption with its accompanying termination of parental rights, the DSS must consider the following factors enumerated in FL subsection 5-525(e):
 

 (i) the child’s ability to be safe and healthy in the home of the child’s parent;
 

 (ii) the child’s attachment and emotional ties to the child’s natural parents and siblings;
 

 (iii) the child’s emotional attachment to the child’s current caregiver and the caregiver’s family;
 

 (iv) the length of time the child has resided with the current caregiver;
 

 (v) the potential emotional, developmental, and educational harm to the child if moved from the child’s current placement; and
 

 (vi) the potential harm to the child by remaining in State custody for an excessive period of time.
 

 In addition to prescribing procedures for reviewing the welfare of children in foster care, the General Assembly also listed, in FL section 5-313(c)(2), these similar factors that
 
 *436
 
 courts must consider in determining whether to terminate parental rights:
 

 (i) the timeliness, nature, and extent of the services offered by the child placement agency to facilitate reunion of the child with the natural parent;
 

 (ii) any social service agreement between the natural parent and the child placement agency, and the extent to which all parties have fulfilled their obligations under the agreement;
 

 (iii) the child’s feelings toward and emotional ties with the child’s natural parents ...;
 

 (iv) the child’s adjustment to home, school, and community;
 

 (v) the result of the effort the natural parent has made to adjust the natural parent’s circumstances, conduct, or conditions to make it in the best interest of the child to be returned to the natural parent’s home, including:
 

 1. the extent to which the natural parent has maintained regular contact with the child under a plan to reunite the child with the natural parent ...;
 

 2. if the natural parent is financially able, the payment of a reasonable part of the child’s substitute physical care and maintenance;
 

 8. the maintenance of regular communication by the natural parent with the custodian of the child; and
 

 4. whether additional services would be likely to bring about a lasting parental adjustment so that the child could be returned to the natural parent within an ascertainable time, not exceeding 18 months from the time of placement, but the court may not consider whether the maintenance of the parent-child relationship may serve as an inducement for the natural parent’s rehabilitation; and
 

 (vi) all services offered to the natural parent before the placement of the child, whether offered by the agency to which the child is committed or by other agencies or professionals.
 

 For children who have been adjudicated CIÑA, FL subsection 5—313(d) requires the court also to consider
 

 
 *437
 
 whether any of the following continuing or serious conditions or acts exist:
 

 (i) the natural parent has a disability that renders the natural parent consistently unable to care for the immediate and ongoing physical or psychological needs of the child for long periods of time;
 

 (ii) the natural parent has committed acts of abuse or neglect toward any child in the family;
 

 (iii) the natural parent has failed repeatedly to give the child adequate food, clothing, shelter, and education or any other care or control necessary for the child’s physical, mental, or emotional health, even though the natural parent is physically and financially able;
 

 (iv) 1. A. the child was born exposed to cocaine, heroin, or a derivative thereof as evidenced by any appropriate tests of the mother or child; ... and
 

 2. the natural parent refuses the recommended level of drug treatment, or fails to fully participate in the recommended level of drug treatment!.]
 

 There is good reason to require courts to consider these factors and then explain on the record a decision to terminate parental rights.
 

 A mistake in the process would irrevocably deprive the parent of a fundamental constitutional right. It is for this reason that every procedural safeguard must be carefully followed. Thus, the applicable statute has been construed to require express findings of fact with regard to each statutory factor, before a decision granting a petition to terminate parental rights may be sustained.
 

 In re Adoption/Guardianship No. 95195062,
 
 116 Md.App. 443, 460-61, 696 A.2d 1102 (1997).
 

 The Decision To Terminate The As’ Parental Rights
 

 In this instance, the court fulfilled its threshold obligation to consider the specific factors and conditions enumerated in FL subsections 5-313(c) and 5-313(d). Among those circumstances that applied to Victor, the court found with
 
 *438
 
 respect to Mr. A., that he paid child support; maintained regular contact with Victor and regular communications with Mrs. Plumley; did not “commit[ ] an act of negligence towards [Victor]”; and did not repeatedly fail to give Victor adequate food, clothing, shelter, and education or any other care or control necessary for [his] physical, mental or emotional health[.]” Unlike Ms. A, whose substance abuse and bipolar II disorder rose to the level of “a disability that render[ed her] consistently unable to care for the immediate and ongoing physical or psychological needs of [Victor] for long periods of time,” the court found that “Mr. A did not suffer from any such type of disability.” Mr. A “substantially complied” with his agreement to participate in parenting classes. With respect to the critical factor of whether returning Victor to Mr. A would pose an unacceptable risk to Victor’s future safety, the court stated that it “cannot make such a finding[.]”
 

 Thus, the court determined that most of the relevant factors and conditions identified in sections 5-313 and 5-525 did not justify terminating Mr. A’s parental rights. Rather, the court concluded only that Mr. A did not fulfill his agreement to “obtain adequate housing[.]” The court treated Mr. A’s failure to arrange for appropriate housing as a failure to “put himself in a position to make it in the best interests based on the conditions as they exist today to return [Victor] to him.”
 

 The circuit court then turned to the ultimate issue of whether to terminate the As’ parental rights. It explicitly framed its decision in terms of the requirements of FL subsection 5—313(a)(3).
 
 [7]
 
 That subsection allows a court to
 
 *439
 
 terminate parental rights and to grant the DSS guardianship with the right to consent to adoption “if the court finds by clear and convincing evidence that it is in the best interest of the child” to do so and determines that
 

 the following set of circumstances exists:
 

 (i) the child has been continuously out of the custody of the natural parent and in the custody of a child placement agency for at least 1 year;
 

 (ii) the conditions that led to the separation from the natural parent still exist or similar conditions of a potentially harmful nature still exist;
 

 (iii) there is little likelihood that those conditions will be remedied at an early date so that the child can be returned to the natural parent in the immediate future; and
 

 (iv) a continuation of the relationship between the natural parent and the child would diminish greatly the child’s prospects for early integration into a stable and permanent family.
 

 FL § 5-313(a)(3)(emphasis added).
 

 The court easily concluded that the first two circumstances were present. With respect to the third circumstance, the
 
 *440
 
 court found that neither parent was likely to become able to care for Victor in the immediate future. “Mrs. A ... is still in a position of dealing with her own personal problems, and Mr. A has really not put himself in a better position to deal with Victor, Junior’s problems[,]” having “chose[n] to wait for the [ejourt to act before acting” to remedy his housing inadequacy.
 

 The court then considered the fourth and last circumstance. It acknowledged that there is a factual dispute about whether continuing the parent-child relationship would significantly reduce Victor’s chances for adoption or for successful early integration into an adoptive family.
 

 The Department says that it would. The counsel on behalf of Mr. and Mrs. A argue that it wouldn’t. The [ejourt finds that from the child’s perspective that, in essence, the dynamics of this particular case is that the County, the Department, has, in fact, offered services. And that the different terms of view with respect to what is in the best interests of the child, in terms of the County, is apparent. We just take the position against the natural parents’ beliefs that the conflict is going to exist. And that the unfortunate situation for the [ejourt is that, at least as the case is postured today, is the [ejourt is going to have to choose between one of the parents.
 

 The court proceeded to address the ultimate matter of whether termination is in Victor’s best interest.
 

 So now we get to the question as to whether the [ejourt finds by clear and convincing evidence that it is in the best interests of the child to terminate the natural parent’s rights. And that is what it all comes down to. And this is the hard part.
 

 The [ejourt is clearly convinced that the [cjounty is a better parent and that it is in the better interests of the child. But whether it is in the best interests to terminate his parents’ rights I am not sure. I am not going to say at 5:08 [p.m.J whether it is. (Emphasis added.)
 

 After suggesting mediation, the court took the DSS’s petition under advisement. Six weeks later, on September 29, it
 
 *441
 
 issued a written order granting the petition. In pertinent part, the order stated:
 

 [Tjhis [c]ourt concludes that it is in the best interests of Victor [A] for termination of his natural parents rights; and....
 

 [T]he [cjourt also finds that until such time as the “Department” identifies such adoptive or long-term resource, that it is in the best interests of Victor ... to continue visitation with [Ms. A. and Mr. A] under the supervision of the “Department.”
 

 We find the court’s decision to terminate the As’ parental rights inadequate in two respects. First, the court did not make an essential factual finding. The Court of Appeals has “made clear that required findings of fact in a termination of parental rights case are essential, so that an appellate court can effectively review this ‘drastic measure.’ ”
 
 In re Adoption/Guardianship 95195062,
 
 116 Md.App. at 461, 696 A.2d 1102 (citing
 
 In re Adoption/Guardianship No. 87A262,
 
 323 Md. 12, 20, 590 A.2d 165 (1991)). The task of determining whether continuing either one of the As’ parent-child relationships is likely to “greatly diminish” Victor’s prospects of finding and integrating into an adoptive home—the finding required by section 5-313(a)(3)(iv)—belonged to the circuit court sitting as a fact-finder.
 

 The court never decided whether or how continuation of the As’ parental rights would harm Victor’s prospects for adoption, or otherwise diminish his ability to integrate early into an adoptive home. Neither the bench colloquy nor the written order clearly resolved that issue with respect to either parent. To the contrary, the court’s decision that it is in Victor’s best interest to continue parental visits “until such time as the [DSS] identifies such adoptive or long-term resource” suggests the court was not persuaded that allowing the As to continue their relationship with Victor would hurt those prospects. We hold that it was error to terminate the As’ parental rights under section 5—313(a)(3) without determining that continua
 
 *442
 
 tion would diminish Victor’s opportunity to find a suitable adoptive home.
 

 But that was not the only inadequacy. The court’s second error was that it did not explain its mixed conclusion of fact and law that termination of the As’ parental rights is in Victor’s best interest. Given the court’s many favorable factual findings on the section 5-313(c) and (d) factors (at least with respect to Mr. A), the uncertainties about the value of termination to Victor as expressed by the court at the end of the August 14 hearing, the court’s failure to find that continuing the As’ relationship with Victor greatly diminished his prospects for early integration into a stable and permanent family, and its decision to continue the As’ visiting relationship with Victor, we decline the DSS’s invitation to rubber stamp the court’s unexplained statement that termination is in Victor’s best interest.
 

 A finding that terminating parental rights is in a child’s best interest is a judicial determination with extreme constitutional and emotional consequence. For that reason, we cannot approve boilerplate statements that merely repeat the best interest standard. The specific reasons for the court’s best interest determination must be explained on the record, in a manner that permits appellate review. Here, the circuit court erred in failing to articulate why it concluded that termination is in Victor’s best interests.
 

 Both omissions tainted the decision to terminate the As’ parental rights. Subsection 5-313(a)(3) authorizes the court to exercise its power to terminate only if it finds by clear and convincing evidence that termination is in Victor’s best interests and that it is necessary to ensure Victor’s prospects for early integration into a permanent home. We are not permitted to delve into the record to make necessary factual findings or to concoct a
 
 post hoc
 
 explanation for the circuit court’s termination decision.
 
 See In re Adoption/Guardianship 95195062,
 
 116 Md.App. at 460, 696 A.2d 1102. Consequently, the circuit court’s failures to make the requisite “diminished prospects” finding and to explain why termination of each
 
 *443
 
 parent’s rights is in Victor’s best interest require us to vacate the order and remand for further proceedings.
 
 [8]
 

 The DSS’s Reasons For Seeking Termination
 

 Because the remand court may be asked to consider them, we shall address two of the primary arguments offered by the DSS in support of its decision to seek adoption and termination.
 
 See
 
 Md. Rule 8-131 (a). The DSS asserts that “[o]nly termination of parental rights offers Victor ... the opportunity to find a permanent, stable home through adoption” and that “all foster care is inherently unstable.” Victor’s caseworkers testified that they did not consider, as an alternative to adoption with termination of parental rights, leaving Victor with Plumley (or another therapeutic foster parent) and letting the A’s exercise their parental rights through visitation, because “[t]here has to be some movement on these cases. That’s part of the policy.” When asked specifically why the DSS ruled out long term foster care for Victor, they pointed to the statutory priority favoring adoption:
 

 Long-term foster care is pretty far down on the list. It’s ... the last resort for a child. It leaves the child in limbo[.]
 

 In this appeal, the DSS and counsel for Victor continue to argue that “[t]he law frowns on [the As’] solution of long-term foster care.”
 

 The DSS’s rather shallow explanations for its decision to seek termination raise concern that the DSS considers termination of the As’ parental rights to be justified by either its need to explore adoption prospects for Victor or a presumption that adoption is “inherently” or “always” better than
 
 *444
 
 foster care. A decision to seek termination of parental rights may not be premised solely on these reasons.
 

 As a threshold matter, we emphasize that there is nothing in the statutory scheme governing termination of parental rights mandating that termination must occur before the DSS can begin to investigate and work toward adoption. To the contrary, the General Assembly explicitly authorized local departments to undertake “[reasonable efforts to place a child for adoption or with a legal guardian ... concurrently with [other] reasonable efforts,” such as reunification.
 
 See
 
 FL § 5—525(d)(3). Thus, we see no impediment to the DSS investigating the adoption prospects for a particular child before it then decides to seek termination. Consequently, we do not agree with the DSS that “only termination offers Victor” the “opportunity to find a permanent stable home through adoption.”
 

 Nor can we agree that the statutory priority given to adoption should be treated as a generic instruction to seek adoption and termination in all cases. To be sure, there is a clearly articulated public policy favoring adoption over foster care. In FL sections 5-525(e) and 5-525.1(c), and CJ section 3-823(f), the General Assembly expressed its preference for reunification, adoption, and kinship care over continued foster care. But these provisions do not create a conclusive, unrebuttable presumption that adoption and termination are always preferable in every case. The best interest standard “does not require simply that a determination be made that one environment or set of circumstances is superior to another. If that were the case, child custody matters would involve rather simple choices.”
 
 In re Yve S.,
 
 373 Md. at 565, 819 A.2d 1030.
 

 Instead, as the statutory priority implicitly recognizes, there may be some cases in which a foster care permanency plan is more desirable than an adoption permanency plan. In particular, the provisions of section 5-525 concerning foster care of children with physical and mental disabilities reveal the General Assembly’s explicit recognition that the most common
 
 *445
 
 solutions of reunification and adoption may not be appropriate for some special needs children.
 

 When, as in this case, the primary reason for a foster care placement is to ensure appropriate care for the child’s physical and mental disabilities, there is an even stronger need for case-specific consideration of whether terminating parental rights is in the child’s best interest. In deciding to seek termination, a local department is not compelled to adhere to the usual statutory time lines. Nor may it rely solely on the statutory priority to define the child’s best interest, or conclusively presume that the child’s best interest will be advanced by terminating his natural parents’ rights in the speculative hope that the local department eventually will identify and recruit an adoptive family who can meet the child’s special needs.
 

 Whether Victor is that rare child whose best interests are served by a foster care permanency plan that does not require termination of parental rights, at least for now, is what the DSS and the circuit court were obligated to decide. That determination required more than rote adherence to an “adoption for all” policy and practice. It required a detailed examination of Victor’s individual needs, his specific prospects for finding a suitable adoptive or permanent foster care home, and the relative advantages and disadvantages of the proposed adoptive home over any permanent or long term foster care alternatives.
 

 We cannot discern from this record whether Victor received this type of individualized consideration. Although there was evidence that, after deciding to change the permanency plan to adoption, the DSS used a national database to locate potentially “licensed and available and interested” adoptive homes in Ohio, Pennsylvania, and Michigan, the court’s order shows that it did not find any of those prospects to be sufficiently “identified” or viable that they warranted cutting off Victor’s visits with his parents. Together, the testimony of the DSS caseworkers and the DSS’s reliance on generic reasons for terminating the As’ parental rights suggest that
 
 *446
 
 the DSS may have rejected the less drastic alternative of finding Victor a permanent foster home that would allow the As’ to maintain their parental rights because it treated the statutory priority for adoption as a conclusive presumption that adoption is always better than foster care for every child.
 

 Whether the prospect of future adoption justifies terminating the rights of parents whose young child’s physical and mental health limitations demand that he live “in the here and now” is something that the DSS and the circuit court must also consider. There is substantial evidence in this record to support the circuit court’s finding that it is in Victor’s best interest to continue a relationship with his parents while the DSS searches for a suitable permanent home. As reflected in the visitation order, the court was not convinced that Victor would benefit from ending his relationship with his parents at a time when the court felt there was no specifically identified prospect for adoption. The search for a suitable adoptive family may prove to be difficult and long. We see no evidence that continuing the As’ parental rights along with their visitation is likely to impair Victor’s adoption prospects.
 

 Before deciding to pursue the more drastic course of adoption and termination of parental rights, the DSS and court should carefully consider whether continuing Victor’s current long term foster care placement with Mrs. Plumley (or another suitable caregiver), while allowing Mr. A and/or Ms. A to retain their parental rights and the DSS to continue its search for a permanent home, satisfies Victor’s best interest while preserving the As’ constitutional rights. There are a number of factors relevant to that determination, many of which are not answered by the record before us. These include how long a search might take, whether termination of the As’ parental rights would help Victor during that search, whether there is a suitable permanent foster home that allows continuation of the As’ parental rights, and what advantages Victor might enjoy at a particular home.
 

 What is in the best interest of Victor is a task first for the DSS and ultimately for the circuit court, after careful review
 
 *447
 
 of Victor’s current circumstances.
 
 See In re Yve S.,
 
 373 Md. at 625, 819 A.2d 1030. On remand, the DSS and the circuit court must assess Victor’s best interests without presuming that an adoptive family can be found for Victor only if his parents’ rights are terminated, or that adoption with termination of parental rights is “inherently” or “always” better than foster care and preservation of parental rights.
 
 [9]
 

 JUDGMENT VACATED. CASE REMANDED TO THE CIRCUIT COURT FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION. COSTS TO BE PAID BY PRINCE GEORGE’S COUNTY.
 

 [1]
 

 . Ms. A and Mr. A divorced after Victor's birth.
 

 [2]
 

 . Plumley explained that, for three weeks, she had measured out the exact dosage of the medication that needed to be administered during an overnight visit and gave it to Mr. A. The first week no medication was gone, the second week too much was gone from one bottle and too little from the other, and the final week Victor's medications again were not administered properly.
 

 [3]
 

 . TMAN was created by the DSS and the Prince George's County Health Department to help babies born affected by heroin or cocaine and their mothers.
 

 [4]
 

 . Ms. A was presented with a series of service agreements from the time Victor was born. On August 17, 2000, Ms. A signed a service agreement promising to continue her participation in the CAP program and to attend parenting training. She did so. When Victor was placed with Jackie Plumley in April 2001, Ms. A was presented another service agreement, asking her to undergo a psychological evaluation, participate in substance abuse treatment and urinalyses testing, and take parenting classes for Victor’s special needs. She returned the agreement unsigned, explaining that she disliked the caseworker's statement that Victor was mentally retarded in addition to having cerebral palsy. Ms. A received a substantially similar service agreement on June 29, 2001. She again refused to sign.
 

 After the DSS changed the permanency plan to adoption, on June 14, 2002, Ms. A executed a service agreement, agreeing to another psychological evaluation, random drug testing, substance abuse treatment, and parenting courses specifically designed for the parents of children with special needs. Ms. A complied with those requirements and moved into the Shepherd's Cove shelter, which required drug testing for its residents.
 

 Ms. A received another draft service agreement on August 9, 2002, but stated that she wished to review it with her counsel before signing. The caseworker never received a response from Ms. A. On September 20, the caseworker mailed another draft agreement, this time to both Ms. A and her counsel. But she never heard back from either of them. Ms. A similarly failed to respond to draft service agreements given to her on December 12, 2002 and June 12, 2003.
 

 [5]
 

 . Foster care placements may be made on a short term basis, generally for 180 days or less, under a voluntary placement agreement.
 
 See
 
 FL § 5-525(a)(l). Alternatively, a child may be placed into foster care by a juvenile court that determines he or she has been “abused, abandoned, neglected, or dependent” and in need of an out-of-home placement.
 
 See id.
 

 [6]
 

 . For example, voluntary foster care placements are intended to last "no more than 180 days."
 
 See
 
 FL § 5—525(a)(l)(i). For children who have been declared CIÑA, a permanency plan hearing must be held within 11 months of when a child entered foster care.
 
 See
 
 CJ 3-823(b)(i).
 

 [7]
 

 . The court did not rest its decision solely on Victor's prior adjudication as a child in need of assistance, which is identified as an independent ground for termination in FL section 5-313(a)(2)(court may terminate parental rights if that is in child's best interest and child has previously been adjudicated a child in need of assistance). We assume that was deliberate rather than inadvertent,
 
 see Perry v. State,
 
 381 Md. 138, 154 n. 8, 848 A.2d 631 (2004), particularly since there was good reason to rely on subsection 5-313(a)(3) instead of subsection (2).
 

 The circuit court apparently wished to avoid terminating the As' parental rights based only on the special needs that led to Victor’s CINA proceedings. As the court found, Victor’s CINA adjudication stemmed
 
 *439
 
 from Mr. A's inability to provide the "herculean” care necessary to meet infant Victor’s special needs, not from abuse or consistent neglect. In these circumstances, we infer the court determined that tying its decision to the CINA adjudication would unreasonably and inappropriately "piggyback” the termination of parental rights onto Victor’s special needs.
 

 When, as in this case, a parent’s inability to meet his child’s severe physical and mental health needs at home results in a CINA adjudication, and the child continues to need specialized care that the parent cannot give at home, reliance on the CINA adjudication as grounds for termination effectively would place such profoundly disabled children and their parents at high risk of losing their opportunity to enjoy whatever parent-child relationship they might be able to develop, notwithstanding the child's physical or developmental limitations. In effect, the most disadvantaged of our children always would be at greater risk of losing their relationship with their parents than those children who are more fortunate.
 
 Cf. In re Yve S.,
 
 373 Md. 551, 571, 819 A.2d 1030 (2003)(presumption that child’s best interests are served by maintaining parental rights arises from child’s need for opportunity to develop close and loving relationship with parents, even when parents are among the "most disadvantaged of our adult citizens”).
 

 [8]
 

 . Given our disposition on other grounds, we shall not address the As’ challenges to the court’s conclusion that neither of them will be able to care for Victor within a reasonable period of time. Although there is substantial evidence in this record to support the court’s factual findings, including its finding that returning Victor to Ms. A would pose an unacceptable threat to his safety, the remand court "may give fresh consideration to the entire situation,” including consideration of how the special services provided to the foster parent might aid in caring for Victor at home.
 
 See In re Yve S.,
 
 373 Md. at 625, 819 A.2d 1030.
 

 [9]
 

 . If the DSS has been making efforts during this appeal to locate an adoptive family for Victor, the results of that search may indicate whether there are any viable prospects for adoption that might justify termination of the As' parental rights.