70 A.3d 276

**In re ADOPTION/Guardianship OF JAYDEN G.**

No. 84, Sept. Term, 2012.

Court of Appeals of Maryland.

July 16, 2013.

Nenutzka C. Villamar, Assistant Public Defender (Paul B. DeWolfe, Public Defender, Baltimore, MD), on brief, for Petitioner.

Ann M. Sheridan, Assistant Attorney General (Douglas F. Gansler, Attorney General of Maryland, of Baltimore, MD) for Respondents.

Cherie J. Jones (The Legal Aid Bureau Inc., Riverdale, MD), on brief, for Respondents.

Argued before BELL, C.J.,* HARRELL, BATTAGLIA, GREENE, ADKINS, BARBERA and McDONALD JJ.

ADKINS, J.

There is a presumption in our parental rights' jurisprudence that a continuation of the parental relationship is in a child's best interests. Yet, again, in this case, the child and the parent pursue antagonistic goals. The mother argues her parental rights should not have been terminated, while the child seeks adoption by his foster parents, with whom he has lived three quarters of his life.

To be sure, this case presents an unusual situation. After the child spent twenty-seven months in foster care without progress by his parents toward reunification, or a consistently active involvement by other relatives, the court decided it was time to pursue a plan of adoption by non-relatives. This order—changing the permanency plan to adoption—triggered the filing of the termination of parental rights ("TPR") petition. The mother, however, appealed the plan change and sought a stay of the TPR case. She succeeded on appeal but not on the motion to stay. As a result, by the time the Court of Special Appeals ruled in the mother's favor on the plan change, her parental rights had been terminated.

She argues the court should not have terminated her parental rights while her appeal of the permanency plan change was pending. But whether to stay a TPR case is within the juvenile court's discretion. In this case, the court did not abuse its discretion because a stay would not have been in this child's best interests. Nor did the court err when—in terminating parental rights—it took into account the child's attachment to his foster parents.

---

* Bell, C.J., participated in the hearing of the case, in the conference in regard to its decision and in the adoption of the opinion, but he had retired from the Court prior to the filing of the opinion.

## BACKGROUND

At the heart of this case is a five-year-old boy, Jayden G., born on September 26, 2007. Surrounding him, in the context of this case, are his two older siblings—Daeshawn E. and Victoria G.; and three adults—Jayden's mother, Jennifer S.; his father, Justin G.;[1] and Jayden's paternal grandmother, Darlene G. We will refer to Ms. S. as the "Mother," Mr. G. as the "Father," and Darlene G. as the "Grandmother."

On February 17, 2009, the three children were found to be Children in Need of Assistance ("CINA") and placed in foster care. Daeshawn and Victoria went to live in one foster home, while Jayden was placed in another. The Department worked long and hard toward the children's reunification with the Mother or the Father. When it became clear, however, that reunification was not likely, the juvenile court ordered a plan of adoption by a non-relative for Jayden and granted limited guardianship over Daeshawn and Victoria to the Grandmother. The Mother appealed the plan of adoption, but while the appeal was pending, the juvenile court terminated her parental rights. The Mother's appeal of Jayden's plan change, however, was successful. This is somewhat of an anomalous result: the Mother won her CINA appeal, but only after her parental rights had been terminated.

### The CINA and TPR Statutes

Two intricately connected, yet separate legal mechanisms, come into play in this case. CINA proceedings are governed by sections 3–801 through 3–830 of the Courts and Judicial Proceedings Article ("CJP"), and TPR proceedings are governed by sections 5–313 through 5–328 of the Family Law Article ("FL"). Before we delve into the facts and the procedural history of the case, we give a brief overview of this statutory framework.

---

1. Jennifer S. is the biological mother of all three children. Justin G. is the biological father of Victoria and Jayden, but not Daeshawn.

*CINA Proceedings*

When a local department of social services receives a complaint of child abuse or neglect, it is required by statute to file a petition with the juvenile court for a determination of whether the child is CINA. CJP §§ 3–801(f), 3–809(a). If the allegations turn out to be true, and the child is committed to an out-of-home placement, the court must hold a hearing to determine a "permanency plan" for the child. CJP § 3–823(b)(1). We explained in *In re Damon M.* that a permanency plan "sets the tone for the parties and the court" and "provides the goal toward which [they] are committed to work." 362 Md. 429, 436, 765 A.2d 624, 627 (2001). In this regard, the permanency plan is "an integral part of the statutory scheme designed to expedite the movement of Maryland's children from foster care to a permanent living, and hopefully, family arrangement." *Id.*

There are five permanency plans to choose from "in descending order of priority:" (1) reunification with a parent or guardian; (2) placement with relatives for adoption, custody, or guardianship; (3) adoption by a non-relative; (4) custody or guardianship by a non-relative; or (5) another planned permanent living arrangement. CJP § 3–823(e)(1)(i). In determining which plan would be in the "best interests of the child," courts consider the child's emotional, developmental, and educational needs. *See* CJP § 3–823(e)(2); FL § 5–525(f)(1).

After the initial permanency planning hearing, the juvenile court is required to review the permanency plan at least every six months. CJP § 3–823(h)(1). At those review hearings, the court makes findings as to "the continuing necessity for and appropriateness of the commitment," "whether reasonable efforts have been made to finalize the permanency plan that is in effect," and "the extent of progress that has been made toward alleviating or mitigating the causes necessitating commitment." CJP § 3–823(h)(2). The court must "[c]hange the permanency plan if a change . . . would be in the child's best interest," and must be cognizant of the statutory requirement that "[e]very reasonable effort . . . be made to effectuate a

permanent placement for the child within 24 months after the date of initial placement." CJP § 3–823(h)(2)(vi) & (h)(3).

### *The TPR*

Many CINA cases do not end with reunification with a parent. But even if "it is determined that reunification is not possible and that adoption is in the child's best interests, the juvenile court lacks jurisdiction to finalize this plan." *In re Adoption/Guardianship No. 10941*, 335 Md. 99, 106, 642 A.2d 201, 205 (1994) (citing *In re Darius A.*, 47 Md.App. 232, 235, 422 A.2d 71, 72 (1980)). "[U]nless the parents consent to the adoption of their child, the department is required to petition the circuit court for guardianship pursuant to F.L. § 5–313." *Id.*

To obtain guardianship, the local department files a TPR petition, which "seek[s] to terminate the existing parental relationship and transfer to itself, hopefully for re-transfer to an adoptive family, the parental rights that emanate from that relationship." *In re Adoption/Guardianship of Rashawn H.*, 402 Md. 477, 496, 937 A.2d 177, 188–89 (2007). Like with the permanency plan considerations in the CINA context, in ruling on a TPR petition, the juvenile court is guided by the child's best interest. *Compare* CJP § 3–823(e), with FL § 5–323(d).

### The CINA Journey of Jayden and His Siblings and the TPR

Three separate CINA cases overlap in this case: Jayden's, Daeshawn's, and Victoria's. There was also a TPR proceeding, which resulted in the termination of the Mother's parental rights to Jayden. Then, there were two appeals with respect to Jayden: one of the permanency plan change and the other of the TPR proceeding. We examine this complex procedural history below, focusing on the facts pertinent to this appeal and saving some details for the analysis section.

### *How Jayden and His Siblings Became CINA*

The involvement of the Montgomery County Department of Health and Human Services (the "Department") in the lives of

Jayden and his older siblings began in May of 2008. At that time, the Mother requested and was granted a protective order against the Father, "alleging that [he] had punched and kicked her, and jabbed a car key into her leg," and "had put a cutter to her throat, stating that he wanted to kill her." These allegations prompted the Department to open an investigation to determine whether the children were receiving proper care and attention.[2]

On January 30, 2009, while the Department's investigation was ongoing, Montgomery County police received phone messages from the Mother, in which she stated that the Father "was trying to poison her and her children were trying to communicate with her by underlining certain sentences in certain books." The next day, while staying at the Betty Ann Krahnke Center, the Mother jumped out of a window, claiming "they were after me." She was later found in the woods behind the Center by the police. After that incident, she was placed in the psychiatric unit at Washington Adventist Hospital.

On February 2, 2009, the Department met with the Mother at the hospital to discuss possible placement options for the children. The Mother "adamantly requested that the children not be placed with [the Father or the Grandmother]," alleging that they "had been trying to poison her." She suggested two relative placement options, neither one of which was acceptable, however.[3] With no viable family placement options, the Department placed the children in shelter care and filed CINA petitions.

---

**2.** Some time later, the Mother reported to the police that the Father had sexually abused Daeshawn, but that allegation was not substantiated.

**3.** The Father was not a suitable placement because he was being investigated for sexual abuse following the Mother's accusations and had a number of convictions for possession of paraphernalia, disorderly conduct, and a second degree assault. Furthermore, on February 5, 2009, he was arrested for violating a Protective Order because he was living with the Mother in derogation of an existing court order.

The CINA petition involving Jayden was heard on February 17, 2009 by the Circuit Court for Montgomery County, sitting as Juvenile Court. Based on the facts stipulated by the parties, in which the Mother and the Father agreed that they were unable or unwilling to care for Jayden, the court found Jayden to be a Child in Need of Assistance. Specifically, the court stated that "it is not currently possible to return the child to the home of the Mother because she is unable to give the Child proper care and attention, and the father is incarcerated."

Around the same time, the court made similar findings with respect to Victoria and Daeshawn and ordered all three children to be committed to the Department for placement in foster care. The Mother and the Father were ordered to undergo psychological and psychiatric evaluations, and to participate in a number of programs, designed to help parents achieve reunification with their children.

The children were placed in different foster homes. Daeshawn and Victoria changed placements three times. They stayed twenty-one months with the first foster family until there were allegations of abuse, and nine months with the second. On July 28, 2011, they were placed with the Grandmother. Jayden, however, has lived with the same foster parents since his original placement with them on February 3, 2009.

### The Permanency Planning Hearings

During the next thirty-four months, from the time Jayden and his siblings were found CINA to December 21, 2011, when the Mother's parental rights to Jayden were terminated, the juvenile court conducted seven permanency planning hearings. Following the initial hearing, held on July 30, 2009, the court ordered a permanency plan of reunification with either parent. This plan was maintained at the next three review hearings, conducted on December 10, 2009; March 22, 2010; and June 11, 2010.

On September 20, 2010, after fourteen months of pursuing a sole plan of reunification with at least one of the parents, the juvenile court ordered that the children's permanency plans change to a concurrent plan of reunification with the Mother and placement with a relative for custody and guardianship. Eight months later, on May 25, 2011, the court established new permanency plans for the children: (1) custody and guardianship by a relative for Daeshawn and Victoria and (2) adoption by a non-relative for Jayden. We review these developments below.

## Reunification with Either Parent

A plan of reunification with either the Mother or the Father was ordered when the children were first found CINA and was maintained for over a year. The evidence presented at the three permanency planning review hearings during that time was substantially the same: the Mother made some effort to give the Department hope that reunification was possible, but she was unable or unwilling to comply with most of the requirements imposed by the court.[4] The Department's reports and recommendations, adopted by the juvenile court, focused on four areas: visitation, employment, mental health, and placement of the children with relatives.[5]

Out of these, visitation is the area in which the Mother was more compliant, at least at the beginning. During the first three months the children were in foster care, she visited with them consistently, demonstrating affection, and informing the Department if she was running late. According to the De-

---

**4.** We do not discuss the Father's efforts because he is not a party to this appeal.

**5.** The court also considered the Department's efforts to help the parents achieve reunification, including providing counseling to the Mother, coordinating psychiatric and abused person's services, and exploring relative placements. As for Jayden's progress, the Department indicated and the court found that Jayden is a "happy one year old boy who is doing well in his foster home. The foster parent ensures that his physical, emotional and social needs are being met. . . . Jayden attends daycare and is doing well."

partment, during that initial time in foster care, "[a]ll three children love[d] their mother and remain[ed] extremely attached to her despite their separation." As time went on, however, the Mother began to neglect her visitation obligations. In the March 2010 report, adopted by the court, the Department noted that, although the Mother "started off diligent in her pursuit to be reunified with her children," "[f]or the last five months, she has been less consistent with visits."

The situation with employment was even less encouraging. The Mother remained unemployed by the first permanency review hearing. At the time of the second permanency plan review hearing, she was employed at a Target, but by the fourth hearing, she was again without housing or employment.

Perhaps most worrisome was the Mother's inability to address her mental health needs. After the incident when she was found in the woods behind Betty Ann Krahnke Center, "exhibiting disorganized and delusional behaviors," she was diagnosed with acute stress and depression and hospitalized at a psychiatric unit for one month "due to suicidal ideations." She was also diagnosed with depression by history, obsessive compulsive personality traits, histrionic features, and narcissistic personality features. The psychologist, who evaluated her, recommended that she "continue seeing her psychiatrist and therapist" and "enroll in the Abused Persons Program." She would not follow up on treatment, however, missing appointments without ever rescheduling.[6] The Mother concedes she "did not comply with the requirement that she obtain psychiatric treatment and medication."

Finally, despite the Department's efforts to find a relative placement for the children, initially, the parents were not able to provide the Department with any adequate placement options.[7] With respect to the Grandmother specifically, the Mother "reported that [she] is not an option and has a past

_____ ·

**6.** The Mother did, however, complete Parent Power classes and attend some classes in the Abused Person's Program.

**7.** As time went on, the Department received more information on the relatives. Several relatives indicated a desire to be considered as

criminal history and ... would not prevent [the Father] from having contact with the children." In the first six months, the Grandmother "only attended one visit on June 9, 2009 when she accompanied [the Mother]." Between July and December 2009, the Grandmother "attended several visits with the children ... and ... expressed an interest in having two children placed with her while the parents work towards reunification." [8]

### Reunification with the Mother

A much bleaker picture of the parents' situation was presented at the fourth permanency planning hearing, conducted on June 11, 2010. In contrast to the Department's position in the earlier reports, where it consistently emphasized the goal of reunification with a parent, the Department began its fourth report by pointing out that "the children have now been in care for 16 months," but neither the Mother nor the Father "has satisfactorily demonstrated that they are in a position to have the children return to live with either one of them."

By then, Jayden "ha[d] been placed out of the home 15 of the last 22 months," and the Department was authorized by statute to file a TPR petition. It explained that it had not done so because it was still exploring relative placements for the children. The Department was awaiting results of the Grandmother's home study, and was planning to undertake a home study of a Mother's cousin. In light of these developments, the Department requested, and the juvenile court reaffirmed, a permanency plan of reunification with the Mother, but not with the Father, for all three children.

### Concurrent Plan of Reunification and Placement with a Relative

The fifth permanency planning hearing took place on September 21, 2010, nineteen months after Jayden and his sib-

---

relative placements, but then either failed to follow up with the Department or were unable to be used as placements for various reasons.

**8.** The report did not indicate which two children the Grandmother was willing to care for pending reunification.

lings were found CINA and placed in foster care. At that time, in accordance with the Department's recommendation, the court ordered that Jayden's permanency plan be changed from reunification with the Mother to a concurrent plan of reunification with her and placement with a Relative or Guardian.

The reason for the change was that Jayden had "been in care for 20 months," but neither the Father nor the Mother had made meaningful progress towards reunification. The Department did observe, however, that the Mother showed "improvement over the past 3 months in terms of her attitude towards the Department, in accepting responsibility for the position in which she finds herself today, and in setting better boundaries with [the Father]."

The Department continued to explore family placement options. The Grandmother failed to "follow up" on the home study request by Prince George's County Department of Social Services because the Mother "reportedly told her that the Department was just looking at reunification." By the time of this permanency planning hearing, the Grandmother had "moved to Montgomery County . . . into a home that can accommodate all three of the children." The Department expressed its intent to consider her as a placement.

### The Abduction and Its Ramifications

The sixth permanency planning hearing was originally scheduled for December 21, 2010 but was rescheduled twice: first to February 8, 2011, then to April 15, 2011. During that time, certain important developments took place. First, on October 12, 2010, the Grandmother and the Mother made allegations that Victoria had been physically abused by her foster parents.[9] These allegations culminated in the Father and the Mother's abducting the children from a scheduled visit.[10]

---

9. These allegations were not substantiated, but the children were moved to a different foster home.

10. The children were found in the Father's home later that day.

The Department attributed some of the fault for this incident to the Grandmother and no longer wished to consider her as a relative placement option, filing a motion to that effect.[11] On November 1, 2010, the juvenile court granted the motion. The court also ordered that the visitation between the Father and the children be terminated and the visitation with the Mother continue but be supervised.

Three months later, on February 8, 2011, the juvenile court rescinded the order rejecting the Grandmother as a placement resource. The court also ordered supervised visitation between the Father, Victoria and Daeshawn, but not Jayden. Although the order did not address the Grandmother's right to visit with the children specifically, her visitation was conditioned on the Father's. Accordingly, in suspending the Father's visitation with Jayden, the order also suspended the Grandmother's visitation with him.[12]

The actual permanency planning review hearing took place two months later. On April 29, 2011, the court ordered the Department to "promptly conduct a Home Inspection of the home of [the Grandmother] for Jayden, Victoria, and Daeshawn for kinship care[.]" At the hearing on May 19, 2011, the Department indicated that it considered the Grandmother to be suitable for custody and guardianship over Daeshawn and Victoria.

With respect to Jayden, the Department stated: "The Department is still asking for a plan of adoption by a non-relative for Jayden. [T]he reason for that would be Jayden has

---

**11.** Apparently, the Department thought the Grandmother had something to do with the abduction because she was the first person to see the children that day, at which time she "noticed some scratches on Victoria's face" and began to insist that it was "obvious abuse." When the Mother came to visit with the children later that day, she immediately requested a meeting with the social workers and became "frustrated that the meeting had to occur after the visit."

**12.** On March 18, 2011, the Father filed a motion requesting that the Grandmother have independent visitation rights and that the Department complete a home study for her. At that time, the Department's last contact with the Grandmother as a potential placement resource had been on October 12, 2010.

bonded with the [foster parents]. He's spent two thirds of his life there. And the Department sees that as a very positive development for him." After reviewing the FL § 5–525(f)(1) factors, the juvenile court agreed with the Department and "concluded that it was in Jayden's best interest to change his permanency plan from a concurrent plan of reunification and placement with a relative, to adoption by a non-relative."

*The Events Following the Plan Change*

The Mother timely appealed the plan change to the Court of Special Appeals. She argued that the juvenile court abused its discretion in changing Jayden's permanency plan to adoption by a non-relative, when it could have placed Jayden with the Grandmother. Specifically, she alleged that the juvenile court gave too much weight to Jayden's time in foster care and the bond with his foster parents and failed to assess Jayden's ties with his siblings "as supportive of a plan of custody and guardianship." [13]

On June 24, 2011, while the Mother's appeal was pending in the Court of Special Appeals, the Department petitioned the juvenile court for guardianship over Jayden with the right to consent to adoption or other planned permanent living arrangement.[14] On July 13, 2011, the Mother sought a stay of the TPR case, arguing that proceeding with the TPR "would lead to the possibility of [the TPR court] terminating [her] parental rights only to have the appellate court decide the ... pending appeal in her favor and remand the case." [15] On August 5, 2011, the juvenile court denied the Mother's motion.

---

13. The Mother also challenged the juvenile court's permission for a social worker "to testify, as an expert witness, regarding Jayden's attachment to his foster parents and biological family."

14. On July 28, 2011, the juvenile court reaffirmed the permanency plan of adoption by a non-relative for Jayden. As for Daeshawn and Victoria, however, the juvenile court appointed the Grandmother a limited guardian.

15. Jayden filed a motion in support of the Mother's motion to stay. They also filed motions to stay with the Court of Special Appeals but were unsuccessful as well.

The TPR trial took place in November and lasted five days: from November 14 through November 18, 2011. On December 21, 2011, the court granted the Department's petition, finding that the parents were unfit, that exceptional circumstances existed which made termination of their parental rights in Jayden's best interest, and that terminating the parental rights was in Jayden's best interest.

The Mother's appeal of Jayden's permanency plan change, however, was not resolved until January 19, 2012, which was almost exactly one month after her parental rights were terminated. The Court of Special Appeals held there was insufficient evidence "to support the circuit court's finding that it is in Jayden's best interest to be separated from his family." Thus, the intermediate appellate court vacated the juvenile court's order and remanded the case for a determination of which permanency plan was in Jayden's best interest.

The TPR case proceeded on a parallel appellate track, and the Court of Special Appeals affirmed the termination of the Mother's parental rights in an unreported opinion filed on August 7, 2012. The Mother filed a petition for writ of certiorari to this Court on September 6, 2012. On November 16, 2012, we granted certiorari, *In re Adoption/Guardianship of Jayden G.*, 429 Md. 303, 55 A.3d 906 (2012), to consider both questions she presented:

1. Did the Court of Special Appeals err in affirming the circuit court's order terminating parental rights, where the circuit court proceeded with the termination of parental rights hearing while the appeal challenging the CINA order changing the permanency plan from reunification to non-relative adoption was still pending in the Court of Special Appeals, and where ultimately the order changing the permanency plan was vacated?

2. Did the circuit court err in basing its decision to terminate parental rights on Jayden's prospect of being adopted by, as well as the quality of care being provided by, his current foster care providers?

## DISCUSSION

Despite the complex factual and procedural history, the first issue is easy to formulate: was it appropriate for the juvenile court to proceed with the TPR hearing while the CINA order, changing the permanency plan from reunification to non-relative adoption, was still pending in the Court of Special Appeals? We answer this question in the affirmative, but do so with the recognition that whether to stay the TPR proceedings pending a permanency plan appeal is within the juvenile court's discretion. In this case, the court did not abuse its discretion in proceeding with the TPR case. The court also did not err when, in finding that the termination of the Mother's parental rights was in Jayden's best interests, it took into consideration Jayden's strong attachment to his foster parents.

## I.

### The Right to Parent is Fundamental But Not Absolute

The relationship between a parent and a child holds a special place in the law.[16] As the United States Supreme Court has observed, "[t]he history and culture of Western civilization reflect a strong tradition of parental concern for the nurture and upbringing of their children." *Wisconsin v. Yoder,* 406 U.S. 205, 232, 92 S.Ct. 1526, 1541, 32 L.Ed.2d 15 (1972). The role of parents in caring for their children is "established beyond debate as an enduring American tradition." *Id.,* 92 S.Ct. at 1541–42. In recognition of this principle, the Supreme Court and this Court have long protected the parents' right "to make decisions concerning the care, custody, and control of their children" under the Fourteenth Amendment of the United States Constitution. *Troxel v. Granville,* 530 U.S. 57, 66, 120 S.Ct. 2054, 2060, 147 L.Ed.2d 49 (2000); *see also Meyer v. Nebraska,* 262 U.S. 390, 399, 43

---

**16.** For a discussion on the evolution of the parental rights jurisprudence in Maryland, see Kristina V. Foehrkolb, Comment, *When the Child's Best Interest Calls for It: Post–Adoption Contact by Court Order in Maryland,* 71 Md. L.Rev. 490, 493–99 (2012).

S.Ct. 625, 626, 67 L.Ed. 1042 (1923); *In re Adoption/Guardianship No. 10941,* 335 Md. 99, 112–13, 642 A.2d 201, 208 (1994).

Another paramount consideration is the child's best interest. Recently, in *In re Adoption/Guardianship of Ta'Niya C.,* we reviewed "33 years of Maryland jurisprudence on the topic" and concluded that "the child's best interest has always been the transcendent standard in adoption, third-party custody cases, and TPR proceedings." 417 Md. 90, 112, 8 A.3d 745, 758 (2010).

There is an interesting interplay between the parent's right to parent and the child's best interests. "The law's concept of the family rests on a presumption that parents possess what a child lacks in maturity, experience, and capacity for judgment required for making life's difficult decisions." *Parham v. J.R.,* 442 U.S. 584, 602, 99 S.Ct. 2493, 2504, 61 L.Ed.2d 101 (1979). Moreover, "historically it has recognized that natural bonds of affection lead parents to act in the best interests of their children." *Id.* As a result, there is "a presumption of law and fact—that it is in the best interest of children to remain in the care and custody of their parents." *Rashawn H.,* 402 Md. at 495, 937 A.2d at 188.

But, "[a]s with so many other legal presumptions, experience and reality may rebut what the law accepts as a starting point." *Parham,* 442 U.S. at 602, 99 S.Ct. at 2504. Indeed, "[o]ne need not wander far into the thickets of family law before running into situations and circumstances where application of an absolute right of the parent would fail to produce a just result." *In re Yve S.,* 373 Md. 551, 568, 819 A.2d 1030, 1040 (2003). That is particularly obvious in cases of child abuse, neglect, and abandonment. *See, e.g., In re Adoption/Guardianship Nos. 2152A, 2153A, 2154A,* 100 Md.App. 262, 265, 641 A.2d 889, 890 (1994). It is in those cases that it becomes clear that, although the right to parent is essential in our cultural and legal understanding, it has limitations.

Resolving the conflict between the parent's right to parent and the child's best interest may get tricky. But, "our case

law has been clear and consistent, that, even in contested adoption and TPR cases . . ., where the fundamental right of parents to raise their children stands in the starkest contrast to the State's effort to protect those children from unacceptable neglect or abuse, the best interest of the child remains the ultimate governing standard." *Rashawn H.*, 402 Md. at 496, 937 A.2d at 189. We have explained that the focus of the inquiry into the child's best interest—even with the parental presumption in place—must be on the child, not the parent. *Ta'Niya C.*, 417 Md. at 116, 8 A.3d at 760–61. Importantly, "[i]n balancing fairness to the parent and fulfilling the needs of the child, the child prevails." *In re Ashley S.*, 431 Md. 678, 66 A.3d 1022 (2013).

With this framework in mind, we turn to the present case.

## II.

### The Stay of TPR Proceedings

This appeal presents a situation where the rights and interests of the parent clash with the interests of the child. The Mother seeks a blanket rule requiring a stay in TPR proceedings whenever there is an appeal of a change in the permanency plan from reunification to adoption. Conversely, the Department fears that an automatic stay "will transform the periodic CINA review hearing—designed to speed [up] a child's exit from foster care—into a mechanism for delaying permanence for a child." It argues that, under FL § 5-319(a), TPR petitions are to be adjudicated within 180 days of filing. Jayden voices similar concerns, arguing that an automatic stay "will frustrate the statutory mandate to achieve a timely, permanent placement for the child—the very purpose of the CINA, permanency planning, and TPR proceedings."[17] At oral argument, however, Jayden conceded that a stay may nevertheless be appropriate in some cases.

---

17. Jayden's interests in this case are represented by the Legal Aid Bureau, Inc.

We agree with Jayden that—when it comes to the best interests of a child—the one-size-fits-all approach does not work. The parent does have the right to appeal a permanency plan of adoption, but that right is not absolute. By the same token, the 180–day provision is not to be used as a sword against all motions to stay. The paramount concern here is the child's best interests. Neither automatic stays nor routine denials of motions account for that. Only the exercise of sound discretion does.

### A.   The Interests at Stake

■ The Mother asserts an immediate right to appeal a change in the permanency plan from reunification to adoption and complains that this right would be forfeited without an automatic stay of TPR proceedings. On the other end of the spectrum, the Department argues that any extension beyond the 180–day limit is prohibited by FL § 5–319(a) and carries with it the risk of harming the prospects of achieving permanency in a child's life. Jayden takes a middle ground. He maintains that, although a stay was not in his best interests, courts should not routinely deny stays in other cases.

### A Parent's Right to Appeal

A parent's right to appeal an interlocutory order changing the permanency plan from reunification to adoption originates in our decision *In re Damon M.*, 362 Md. 429, 436–38, 765 A.2d 624, 628–29 (2001). Under Section 12–303 of the Courts and Judicial Proceedings Article, interlocutory orders "[d]epriving a parent . . . of the care and custody of his child, or changing the terms of such an order" are immediately appealable. Md.Code (1974, 2013 Repl.Vol.), § 12–303(3)(x) of the Courts and Judicial Proceedings Article. The right to appeal a permanency plan change does not obviously flow from CJP § 12–303, however. When the court changes a permanency plan to adoption, the parent is not deprived of custody because by then the child is already in the Department's custody.

In *Damon M.*, we explained that this type of an interlocutory order is nevertheless immediately appealable because

"when the plan is reunification, there necessarily is ... an expectation—more than a hope—that the parent will regain custody." 362 Md. at 436, 765 A.2d at 628. When the permanency plan is changed to adoption, however, the reasonable efforts to achieve reunification, "including the provision of services to the family," cease. *Id.* at 437, 765 A.2d at 628. This makes "[t]he amendment of the permanency plan to long-term or permanent foster care and adoption ... a change in the terms of the custody order, whenever it was passed." *Id.*

### In re Karl H.

In *Damon M.*, this Court's primary concern was the change in the level of services resulting from the change in the permanency plan. But in a subsequent case—*In re Karl H.*—we emphasized that the main reason orders changing the permanency plan to adoption are immediately appealable is because they have a detrimental effect on the parent's constitutionally protected right to parent. 394 Md. 402, 430, 906 A.2d 898, 914 (2006). Thus, we held in *Karl H.* that—in cases where the permanency plan includes adoption—it does not matter that reunification services continue; the plan change is still immediately appealable because, regardless of reunification efforts, such a plan "is sufficiently far enough along the continuum of depriving a parent of a fundamental right." *Id.* at 430–31, 906 A.2d at 914.

The procedural history in *Karl H.* is as complicated as the one in this case. Like here, there was a CINA case and a TPR case, with corresponding appeals traveling through the appellate channels on parallel tracks. After the permanency plan was changed to adoption in the CINA case, the parent appealed the plan change to the Court of Special Appeals. Meanwhile, the Department filed a TPR petition, which opened a separate TPR case. The juvenile court ruled on the TPR petition even before we heard oral arguments on the propriety of the permanency plan change in the CINA appeal. As a result, by the time we issued our opinion in the CINA case, the petitioner's parental rights had been terminated by

the juvenile court in the TPR case.[18]  *Id.* at 410, 906 A.2d at 902.  We realized we were addressing an issue that was moot, unless the Court of Special Appeals reversed the TPR ruling.[19] *Id.* at 411, 906 A.2d at 903.  We did not dismiss the CINA appeal as moot, however, in the belief that the case presented the type of an issue that is of "public importance," would "likely recur," but would "evade review." *Id.* at 410, 411, 906 A.2d at 902, 903.

The procedural aspects of *Karl H.* are important to its holding.  The procedural posture of the case shows that, in solidifying the parent's right to appeal a permanency plan change to adoption, we were aware of the constraints imposed on that right by the CINA and TPR statutes.  We were cognizant of the requirement under CJP § 3–823(g) that a TPR petition be filed within thirty days of the plan change. *Id.* at 431, 906 A.2d at 914.  We knew very well that such a petition had not only been filed, but had been ruled on by the juvenile court before the CINA appeal was decided. *Id.* at 410, 906 A.2d at 902.  Yet, we did not express any view with regard to the propriety of the juvenile court's action.  Nor did we attempt to have any influence on the outcome of the TPR appeal.  Rather, we accepted as a given that a juvenile court may terminate parental rights while the CINA appeal is pending, and took for granted the possibility that our own

---

**18.**  The timeline in the case was as follows: the permanency plan was changed to a concurrent plan of reunification and adoption on December 10, 2004.  *In re Karl H.,* 394 Md. 402, 408, 906 A.2d 898, 901 (2006).  The parent timely appealed the plan change to the Court of Special Appeals.  The Department filed a TPR petition on April 5, 2005. *Id.* at 410, 906 A.2d at 902.  The Court of Special Appeals dismissed the permanency plan change appeal in September 2005.  This Court granted certiorari in the CINA appeal in December 2005.  The petitioner's parental rights were terminated in March 2006.  *Id.* The petitioner noted an appeal of the TPR order to the Court of Special Appeals on April 5, 2006.  *Id.* at 410 n. 10, 906 A.2d at 902 n. 10. We issued our opinion in the permanency plan change appeal on September 6, 2006.

**19.**  The Court of Special Appeals did not reverse the TPR, but did consolidate the TPR appeal with the CINA appeal.  *In re Adoption of Karl H.,* (No. 2623, September Term, 2004) & *In re Adoption of Karl H.,* (No. 348, September Term, 2006) (filed August 1, 2007).

opinion in the CINA case may be rendered moot by the resolution of the TPR appeal in the Court of Special Appeals.

The Mother seeks to use *Damon M.* and *Karl H.* to place the parent's right to appeal on a pedestal above any and all considerations. But we did not write those cases that way and they should not be read that way. To be sure, the parent has a right to appeal the plan changing the permanency plan from reunification to adoption, but that right does not foreclose or forestall the pursuit of other, overlapping statutory processes. It must coexist with the statutory provisions encouraging expediency in the resolution of TPR cases and the child's paramount need for permanency, which underlies our CINA and TPR statutes. Although there is a right to appeal, neither *Damon M.* nor *Karl H.* stand for the proposition that there is also an absolute right to stay TPR proceedings pending CINA appeals.

## Emileigh F. and the Stay

The Mother also relies heavily on *In re Emileigh F.*, 355 Md. 198, 733 A.2d 1103 (1999) to argue that terminating her parental rights while her CINA appeal was pending was a prohibited action. In *Emileigh F.*, a child was found CINA while in the mother's custody and later placed in the custody of her father. *Id.* at 200, 733 A.2d at 1103–04. The mother appealed the latter order, but while the appeal was pending in this Court, the juvenile court—finding the child was no longer a CINA—closed the case. *Id.* at 200–01, 733 A.2d at 1104. In the meantime, this Court issued an opinion, reversing the juvenile court's award of custody to the father. *Id.*

When this Court realized that the case had been closed, it issued certiorari on its own initiative and held that the juvenile court should not have terminated the case while the appeal was pending. *Id.* at 204, 733 A.2d at 1105. We explained: "the action taken by the juvenile court addressed matters that were clearly involved in the pending appeal [and], if permitted, would in essence defeat the right of [the parent] to prosecute her appeal with effect." *Id.* The Mother finds support in this

language and argues that *Emileigh F.* should dictate the outcome of this case.

We agree with the Department, however, that *Emileigh F.* does not determine whether it was proper for the juvenile court in this case to proceed with terminating the Mother's parental rights. We do so for two reasons.

First, unlike in *Emileigh F.*, where there was no statutory provision instructing the juvenile court to take action, in this case we have a statute that directs the juvenile court to rule on TPR petitions within 180 days of filing. The Department emphasizes, citing *In re Deontay J.*, 408 Md. 152, 968 A.2d 1067 (2009), there is a difference "between prohibited action that frustrates a party's right to appeal and a juvenile court's permitted action, in a child's best interests, that has the incidental effect of rendering an appeal moot." [20]

In *Deontay J.*, a child was taken from the mother's custody, found CINA, and placed with the father. 408 Md. at 155–56, 968 A.2d at 1068–69. At a later time, he was moved into the Department's custody, and the father appealed. *Id.* at 156–57, 968 A.2d at 1069–70. While the appeal was pending, the Department's view regarding the father's parenting abilities changed, and it was willing to return the child to his custody. *Id.* at 162, 968 A.2d at 1072. The juvenile court, however, refused to take "further action until" the father's appeal was resolved, and "it received instructions from this Court." *Id.*

We held that the juvenile court erred in refusing to consider placing the child in the father's custody pending appeal. Noting the differences between that case and *Emileigh F.*, we observed that "[p]rohibited action by the trial court that

---

**20.** In support of this argument, the Department also cites *In re Julianna B.*, 407 Md. 657, 967 A.2d 776 (2009), which likewise supports the view that there are instances when a subsequent trial court order may render an appeal moot. In *Julianna,* the juvenile court amended a permanency plan and commitment order for a juvenile delinquent while the appeal of a previous order was pending. *Id.* at 662, 967 A.2d at 779. When the case reached us, we dismissed it, concluding—without disapproval—that the subsequent order rendered the appeal moot. *Id.* at 668, 967 A.2d at 782.

defeats the right of a party to prosecute an appeal is distinguishable from permitted action by the trial court that renders a case moot." *Id.* at 163, 968 A.2d at 1073. We explained that the juvenile court was not prohibited from changing the child's custody pending appeal because it "has a duty to modify a custody order when persuaded that a modification is necessary to protect the health, safety and well-being of a CINA." *Id.* at 164, 968 A.2d at 1074. We held that "there is no reason why the appeal of a custody order divests the circuit court of jurisdiction to decide the merits of a claim that a change of custody is in the best interest of the child whose custody order is at issue in the pending appeal." *Id.* at 167, 968 A.2d at 1075.

In this case, like in *Deontay J.*, the termination of the Mother's parental rights was a permitted independent action that only had the incidental effect of rendering an appeal moot. As the Department emphasizes, the juvenile court's proceeding with the TPR case was expressly authorized by FL § 5–319(a), which provides that the juvenile court "shall rule on a TPR petition within 180 days of filing." If the statute expressly authorizes the court's action, it cannot reasonably be characterized as "prohibited" action.

The second reason *Emileigh F.* does not determine the outcome of this appeal is that the case that the juvenile court closed in *Emileigh F.* was the same case that was being reviewed by this Court at the same time. In contrast, in this case, the TPR ruling was made in one case, but the change in the permanency plan was being appealed in another case.[21]

---

**21.** The intermediate appellate court was of the same view. It explained the differences between *Emileigh F.* and this case as follows:

The situation in *Emileigh F.* was notably different from the facts of the present case. There, the mother appealed her daughter's adjudication as a CINA. We affirmed, and the Court of Appeals granted certiorari. While the case was pending before the Court of Appeals, the juvenile court granted the Department's motion for an order of rescission and termination of juvenile court jurisdiction, effectively closing the CINA case. The Court of Appeals held that this action was inconsistent with the pending appeal, and vacated the judgment closing the CINA proceedings. In the present case, on the other

Although "a CINA adjudication must precede a TPR determination, it is a separate legal proceeding." *In re Adoption/Guardianship of Cross H.*, 200 Md.App. 142, 150, 24 A.3d 747, 752 (2011), *cert. dismissed,* 431 Md. 371, 65 A.3d 679 (2013). The two are governed by different statutes, serve different purposes, depend on different factors, require different standards of proof, and follow different case tracks. We address these differences below.

As we stated above, CINA proceedings are governed by the Courts and Judicial Proceedings Article, and TPR proceedings are governed by the Family Law Article. They serve different purposes: CINA proceedings are designed "[t]o provide for the care, protection, safety, and mental and physical development of" children found CINA; "conserve and strengthen the child's family ties;" ensure that parents and local departments work together to "remed[y] the circumstances that required the court's intervention;" and "achieve a timely, permanent placement for the child consistent with the child's best interests." CJP § 3–802(a). In contrast, when the Department initiates TPR proceedings, it "seek[s] to terminate the existing parental relationship." *Rashawn H.*, 402 Md. at 496, 937 A.2d at 188–89. It files the TPR petition when it believes a child's welfare will be best served in the care and custody of others, rather than the natural parents. *See Yve S.*, 373 Md. at 572, 819 A.2d at 1043.

Further distinguishing CINA and TPR proceedings is that, in these two types of proceedings, courts consider different factors. The CINA statute focuses on factors that mostly have to do with the child's present well-being and the likely effect of a change of placement or remaining in foster care:

hand, when the TPR case was heard, the CINA appeal was pending before this Court. No action was taken to close the CINA case proceedings.

*In re Adoption/Guardianship of Jayden G.*, (No. 2299, September Term, 2012) (filed August 7, 2012) (quoting *In re Adoption/Guardianship of Cross H.*, 200 Md.App. 142, 149–50, 24 A.3d 747, 752 (2011), *cert. dismissed,* 431 Md. 371, 65 A.3d 679 (2013)).

(i) the child's ability to be safe and healthy in the home of the child's parent;

(ii) the child's attachment and emotional ties to the child's natural parents and siblings;

(iii) the child's emotional attachment to the child's current caregiver and the caregiver's family;

(iv) the length of time the child has resided with the current caregiver;

(v) the potential emotional, developmental, and educational harm to the child if moved from the child's current placement; and

(vi) the potential harm to the child by remaining in State custody for an excessive period of time.

FL § 5–525(f)(1)(i)–(vi); *see also* CJP § 3–823(e)(2).

Although the TPR statute likewise requires courts to "give primary consideration to the health and safety of the child," it covers a broader range of considerations. It requires juvenile courts to make specific findings with respect to the past actions of the parents toward the child, and efforts the parents and the department made towards reunification, including:

(1)(i) all services offered to the parent before the child's placement . . .;

(ii) the extent, nature, and timeliness of services offered by a local department to facilitate reunion of the child and parent; and

(iii) the extent to which a local department and parent have fulfilled their obligations under a social services agreement, if any;

(2) the results of the parent's effort to adjust the parent's circumstances, condition, or conduct to make it in the child's best interests for the child to be returned to the parent's home . . .;

(3) whether:

(i) the parent has abused or neglected the child or a minor and the seriousness of the abuse or neglect. . . .

FL § 5–323(d). The TPR statute pays particular attention to the parent's efforts at remedying the circumstances that led to the court's intervention, requiring courts to consider, under the second category, the following factors:

(i) the extent to which the parent has maintained regular contact with:

1. the child;
2. the local department ...; and
3. if feasible, the child's caregiver;

(ii) the parent's contribution to a reasonable part of the child's care and support, if the parent is financially able to do so;

(iii) the existence of a parental disability that makes the parent consistently unable to care for the child's immediate and ongoing physical or psychological needs for long periods of time; and

(iv) whether additional services would be likely to bring about a lasting parental adjustment so that the child could be returned to the parent within an ascertainable time not to exceed 18 months from the date of placement unless the juvenile court makes a specific finding that it is in the child's best interests to extend the time for a specified period.

FL § 5–323(d)(2).

That in TPR proceedings courts are required to take into consideration additional factors is not the only difference between CINA and TPR proceedings. Different evidentiary burdens also apply. TPR proceedings require a "clear and convincing" standard of proof, but CINA adjudications are made based on the lesser "preponderance of the evidence" standard. *In re Blessen H.*, 163 Md.App. 1, 16, 877 A.2d 161, 169–70 (2005), *aff'd*, 392 Md. 684, 898 A.2d 980 (2006). Furthermore, in a permanency plan review hearing, strict application of the Maryland Rules of Evidence is not required. Md. Rule 5–101(c)(6); *In re Ashley E.*, 158 Md.App. 144, 161, 854 A.2d 893, 903 (2004), *aff'd*, 387 Md. 260, 874 A.2d 998 (2005). It is, however, required in a TPR proceeding. *See* Md. Rule 5–101(c).

Finally, the changing of the permanency plan to adoption is not a prerequisite to the filing of a TPR petition. The Mother argues that "the circuit court should not proceed with a TPR hearing until the appellate courts have conclusively determined that the decision to order a permanency plan of adoption was correctly reached," suggesting that a reversal of the change of the permanency plan to adoption necessarily undermines the footing on which the TPR proceedings stand. But, "the changing of the permanency plan from reunification, or adoption by a relative, to adoption by a non-relative, is not required before the Department can file a TPR petition." *Cross H.*, 200 Md.App. at 150, 24 A.3d at 752.

Under the CINA and Child Welfare Services provisions, there are three ways in which TPR proceedings may be initiated. First, as in this case, the department is required to file a TPR petition after the juvenile court finds that a permanency plan of adoption by a non-relative is in the child's best interests. *See* CJP § 3–823(g). Second, FL § 5–525.1(b) requires the department to file a TPR petition when "the child has been in an out-of-home placement for 15 out of the most recent 22 months." Third, if the department "determines that adoption . . . is in the best interest of the child," it is required to "refer the case to the agency attorney," and the attorney must file a TPR petition. FL § 5–525.1(a).

For these reasons, we reject the Mother's argument that TPR proceedings must be automatically put on hold when a parent appeals a CINA plan change. Although, without a stay of TPR proceedings, the outcome of the parent's appeal of a change in the permanency plan may be rendered moot, our holdings in *Damon M.*, *Karl H.*, and their progeny, even when combined with our holding in *Emileigh F.*, simply do not add up to the conclusion the Mother advocates. Indeed, in *Karl H.* itself, in deciding to review an appeal rendered moot by a subsequent TPR, we acknowledged the possibility that this might happen in some cases. *See* 394 Md. at 411, 906 A.2d at 903. Thus, we reject the Mother's invitation to issue a blanket rule, which would require automatic stays in all TPR cases with pending CINA appeals.

*The 180–Day Provision*

■ The Department advances a different, but also a categorical, position. It maintains that FL § 5–319(a) leaves juvenile courts no choice but to deny motions to stay TPR proceedings. As we discussed above, FL § 5–319(a) provides that "a juvenile court shall rule on a guardianship petition . . . within 180 days after the petitioner is filed." Citing *Goins v. State*, the Department argues that "statutes and rules that govern 'procedure setting forth requirements in mandatory terms are not guides to the practice of law but precise rubrics . . . to be read and followed.'" 293 Md. 97, 109, 442 A.2d 550, 556 (1982) (citations omitted). Thus, in the Department's opinion, "[b]ecause the guardianship petition in this case was filed on June 24, 2011, the juvenile court was required to conclude and rule on the petition by December 24, 2011, a task the court would not have accomplished had it awaited the appellate court's decision in the CINA appeal."

Our intermediate appellate court had an opportunity to examine the import of the 180–day requirement in *In re Abiagail C.*, 138 Md.App. 570, 772 A.2d 1277 (2001).[22] The parent in that case attempted to use the 180–day time limit as a statute of limitations, arguing that the TPR petition should have been dismissed because the juvenile court failed to rule on it within 180 days. *Id.* at 579, 772 A.2d at 1283. The Court of Special Appeals disagreed, holding that the provision had no mandatory connotation. *Id.* at 584, 772 A.2d at 1286.

The intermediate appellate court began its analysis by discarding the argument that, just because the statute contained the word "shall," the juvenile court is required to rule on the TPR petition within 180 days. *Id.* at 581, 772 A.2d at 1284. The court pointed out that the word "shall" does not always constitute a mandatory term, but may be directory only:

---

**22.** To be exact, *In re Abiagail C.*, 138 Md.App. 570, 772 A.2d 1277 (2001) discussed an earlier version of the statute, which was codified at FL § 5–317(d).

Depending on the context, placement, and use of the word "shall," and the nature of the constitutional provision or statute in which it appears, the word may have a mandatory connotation, so as to require that the action that "shall" be done must be done, or may be directory in meaning, so as to exhort the doing of the thing that "shall" be done without requiring it.

*Id.* In the context of "a constitutional provision or enactment appearing to impose a duty on the court," the word "shall," however, is more often "viewed as directory in meaning," not mandatory. *Id.*

Indeed, there is "reasonable continuity in the line of cases dealing with interpretation of the word 'shall' directed toward an arbiter's time constraints for issuing a decision." *G & M Ross Enterps., Inc. v. Bd. of License Comm'rs,* 111 Md.App. 540, 544, 682 A.2d 1190, 1192 (1996). Under this line of cases, "if a statute governs the actions of an arbiter, [be it a court or an administrative agency,] its use of the word 'shall' will generally be interpreted as directory, rather than mandatory." [23] *Id.* at 545, 682 A.2d at 1193. Thus, the presence of the word "shall" in FL § 5–319 does not at all necessitate a conclusion that the juvenile court must rule on a TPR petition within 180 days of filing.

Having found no mandatory connotation in the word "shall," the Court of Special Appeals in *Abiagail C.* went on to review the legislative history of FL § 5–319(a). It discovered that FL § 5–319(a), enacted in 1991 as House Bill 295 (1991 Md. Laws, chapter 173), was meant to be "an additional step in the 'speeding up' of the adoption and guardianship process."

---

**23.** For instance, it is well-settled that the word "shall," as used in Article IV, Section 15 of the Maryland Constitution, which concerns this Court's and the Court of Special Appeals' issuance of opinions is directory only. *See McCall's Ferry Power Co. v. Price,* 108 Md. 96, 113, 69 A. 832, 838 (1908). Likewise, the constitutional provision with respect to the circuit courts, providing that they "shall render their decisions . . . within two months," is directory in nature. *See Md. State Bar Ass'n v. Hirsch,* 274 Md. 368, 373–74, 335 A.2d 108, 111–12 (1975).

*Abiagail C.*, 138 Md.App. at 585, 586, 772 A.2d at 1286. That was apparent from the evidence in the legislative history that the 180–day provision was put in place to "assist the courts in assigning a higher priority to these cases." *Id.*

For instance, in supporting this legislation, the Department of Human Resources explained to the General Assembly its concerns over the increase in TPR petitions filed and the resulting delay in their adjudication:

> the recent enactments designed to streamline the guardian-ship/adoption process had brought about an increase in the number of guardianship cases being filed and, as a result, an increase by almost six months in the average length of time between the filing and disposition of those cases.

*Id.* It advocated for the enactment of HB 295, " 'establishing [a] time frame[ ] for the courts to hear these cases ... [to] assist the courts in assigning a higher priority to these cases and thus enable earlier implementation of adoption plans for children.' " *Id.* (alterations in original). Similar evidence was presented in the Senate on "an identical cross-filed Senate Bill (SB 656)," where the testimony was that the legislation was "intended to reduce the length of time involved in implementing adoption plans for foster children." *Id.* (quoting S. Jud. Proc. Comm. Rep., HB 295 (1991)) (quotation marks omitted).

That the provision encourages courts to rule on TPR petitions in an expedient manner, however, does not mean that this goal takes on a life of its own, leaving juvenile courts no choice but to rule on TPR petitions within 180 days or else risk dismissal, as the mother argued in *Abiagail C.*, or reversal, as the Department would argue. Without a doubt, the 180–day provision is not mandatory on the court.

In "real-time," even without a juvenile court granting a stay, many TPR petitions are not resolved within 180 days. For instance, in 2005, "the average time for TPR case processing" in Baltimore City "was 1,480 days, with only 39.84 percent of cases being resolved within 180 days, 65.04 percent of cases resolved within 271 days, and 76.42 percent of cases resolved within 365 days." Yolanda A. Tanner, *One Family–One Mas-*

ter Docketing in Juvenile Court, *Md. B.J., May–June 2009, at 26, 29. Faced with this reality, we are not persuaded that the juvenile court in this case was bound to deny the Mother's motion to stay because of the 180–day provision.*

### The Child's Best Interests

Our rejection, on the one hand, of the Mother's argument that the juvenile court had to stay the TPR proceedings and, on the other hand, the Department's argument that the juvenile court was required to deny the motion, brings us to the conclusion that the juvenile court was **not required** to rule in any particular way. Rather, as in many other contexts, the decision of whether to grant the Mother's motion to stay was within the court's discretion. *See Coppage v. Orlove,* 262 Md. 665, 666, 278 A.2d 587, 587 (1971) ("[I]n a proper case a court may stay proceedings pending the determination of another proceeding that may affect the issues raised.") (quoting *Dodson v. Temple Hill Baptist Church Inc.,* 254 Md. 541, 546, 255 A.2d 73, 75 (1969) (quotation marks omitted)); *Vaughn v. Vaughn,* 146 Md.App. 264, 279, 806 A.2d 787, 796 (2002) ("Whether to grant or deny a stay of proceedings is a matter within the discretion of the trial court. . . ."). In exercising this discretion in the context of a TPR proceeding the court's paramount consideration is the child's best interests. *See Ta'Niya C.,* 417 Md. at 94, 8 A.3d at 747.

### A Child's Need of Permanency

A critical factor in determining what is in the best interest of a child is the desire for permanency in the child's life. *See* Nat'l Council of Juvenile and Family Court Judges, *One of the Key Principles for Permanency Planning for Children* (Oct. 1999) ("[A]ll children are entitled to a safe, permanent and nurturing home in order to reach their full potential as human beings."). Permanency for children means having "constant, loving parents," knowing "that their home will always be their home; that their brothers and sisters will always be near; and

that their neighborhoods and schools are familiar places." [24]
Pew Comm'n on Children in Foster Care, *Fostering the
Future: Safety, Permanence and Well–Being for Children in
Foster Care* 9 (2004), *available at* http://www.pewhealth.org/
uploadedFiles/PHG/Content_Level_Pages/Reports/0012.pdf.

"[L]ong periods of foster care" are harmful to the children
and prevent them from reaching their full potential. *See In re
Adoption/Guardianship of Victor A.*, 157 Md.App. 412, 427–29,
852 A.2d 976, 985–86 (2004), *aff'd as modified*, 386 Md. 288,
872 A.2d 662 (2005). There are numerous studies to that
effect. *See* David Fanshel & Eugene B. Shinn, *Children in
Foster Care: A Longitudinal Investigation* (1978); Alan R.
Gruber, *Children in Foster Case: Destitute, Neglected ...
Betrayed* 15 (1978); Henry S. Maas & Richard E. Engler,
*Children in Need of Parents* 4 (1959); Leroy H. Pelton, *For
Reasons of Poverty: A Critical Analysis of the Public Child
Welfare System in the United States* 53–54 (1989); Ann W.
Shyne & Anita G. Schroeder, *National Study of Social Ser-
vices to Children and Their Families: Overview* (1978); Hen-
ry S. Maas, *Children in Long–Term Foster Care*, 48 Child
Welfare 321 (1969). As one author described the detrimental
effects of the lack of permanency,

> The status of a foster child, particularly *for* the foster child,
> is a strange one. He's part of no-man's land.... The child
> knows instinctively that there is nothing permanent about
> the setup, and he is, so to speak, on loan to the family he is
> residing with. If it doesn't work out, he can be swooped up
> and put in another home. It's pretty hard to ask a child or

---

**24.** In the words of one former foster child, permanency is not "going
crazy inside," because "you always have to move from foster home to
foster home and you don't have any say in this and you're always
having to adapt to new people and new kids and new schools." Pew
Comm'n on Children in Foster Care, *Fostering the Future: Safety,
Permanence and Well–Being for Children in Foster Care 9* (2004), *avail-
able at* http://www.pewhealth.org/uploadedFiles/PHG/Content_Level_
Pages/Reports/0012.pdf. In the words of another child, permanency
means not having to "check[ ] every day to see if his belongings had
been packed in anticipation of another move." *Id.* It is the ability to
"believe in themselves," the confidence that they can "grow up to be
somebody," that they have a "future." *Id.*

foster parent to make a large emotional commitment under these conditions. . . .

Joseph Goldstein, *Finding the Least Detrimental Alternative: The Problem for the Law of Child Placement,* in Parents of Children in Placement: Perspectives and Programs 188, n.9 (Paula A. Sinanoglu & Anthony N. Maluccio eds., 1981) (quoting speech by Art Buchwald). Yet, it is this "emotional commitment" and a sense of permanency that are absolutely necessary to ensure a child's healthy psychological and physical development.

Recognizing these needs, federal and state governments "have undertaken ... steps to prevent childhoods spent in 'foster care drift'—the legal, emotional, and physical limbo of temporary housing with temporary care givers." *Victor A.,* 157 Md.App. at 427–28, 852 A.2d at 985. Indeed, "[t]he overriding theme of both the federal and state legislation is that a child should have permanency in his or her life. The valid premise is that it is in a child's best interest to be placed in a permanent home and to spend as little time as possible in foster care." *No. 10941,* 335 Md. at 106, 642 A.2d at 205.

Permanency and Termination of Parental Rights

In accordance with this premise, Maryland's CINA and TPR statutory framework requires that "[e]very reasonable effort shall be made to effectuate a permanent placement for the child within 24 months after the date of initial placement." CJP § 3–823(h)(3). When reunification with a parent is not a viable option, under the CINA and TPR statutory framework, the adoption of the child is viewed—in terms of permanency— as the next best thing.[25] As we have explained in *In re Adoption/Guardianship No. 10941:*

---

**25.** Adoption may not always be the most appropriate permanency solution, however. *See In re Adoption/Guardianship of Victor A.,* 386 Md. 288, 312, 872 A.2d 662, 676 (2005). Foster care placement on a long-term basis may be more appropriate in some instances, such as when "the child is being cared for by a relative, ... DSS has a compelling reason why termination of parental rights would not be in the child's best interests, or ... DSS has not provided timely reunifica-

Only ... a subsequent permanent placement, such as the adoption sought by the grandparents here, can provide [a child] with the permanency he needs and the Legislature has mandated. [A child's] continuation in foster care lacks the permanent legal status required by state law. He remains within the foster care system, and thereby subject to administrative review every six months. He also remains under the jurisdiction of the juvenile court, subject to periodic judicial review. This constant administrative and judicial supervision is disruptive to the lives of [the child] and his grandparents, and is the very type of uncertainty the child welfare statutes were designed to avoid.

335 Md. at 120, 642 A.2d at 212.

But, unless the natural parent gives consent, there can be no adoption (and no permanency) until the natural parent's rights to the child are terminated, which is done when "the circuit court finds by clear and convincing evidence, after considering the statutorily enumerated factors, that [TPR] is in the best interest of a child." *Id.* It is at that time that "the circuit court has authority to grant the department's petition for guardianship," enabling the Department to consent to the child's adoption by relatives or non-relatives. *Id.* Thus, in the event that reunification with the natural parent is not possible, the termination of parental rights serves as the segue to permanency.

A stay of TPR proceedings pending the appeal of a permanency plan, however, would inevitably cause a delay in achieving permanency. When we held in *Damon M.* that CINA orders changing permanency plans to adoption are immediately appealable, we were "[ ]mindful of the concern that ... appeals will slow the realization of permanency for children whose permanency plan amendments are appealed." [26] 362

---

tion services for the parent and child." *Id.* (citing Md.Code (1987, 1999 Repl.Vol.), § 5–525.1(b)(3) of the Family Law Article).

**26.** We "note[d], however, Md. Rule 8–207(b) and suggest[ed] that, to the extent possible, appeals to the Court of Special Appeals from these

Md. at 438, 765 A.2d at 628–29. Staying a TPR proceeding, while a CINA appeal is pending, carries an even bigger risk to "the realization of permanency" because termination of parental rights usually takes place after "lengthy periods" of parents' non-compliance "for a year or more" with the service agreements aimed at helping them achieve reunification with the child. *In re Adoption/Guardianship of Amber R.*, 417 Md. 701, 712, 12 A.3d 130, 136 (2011).

For instance, in *Ta'Niya C.*, the TPR proceedings were initiated almost three and a half years after the child was placed in foster care, 417 Md. at 95–97, 8 A.3d at 748–49; in *In re Ashley E.*, sixteen months later, 387 Md. 260, 273–74, 874 A.2d 998, 1006 (2005); in *In re Adoption/Guardianship of Joshua M.*, almost two and a half years later, 166 Md.App. 341, 345, 888 A.2d 1201, 1203 (2005); and in *In re Adoption/Guardianship No. T00032005*, more than four years later, 141 Md.App. 570, 574–75, 786 A.2d 64, 67 (2001). If a stay of the TPR was required in those cases, the impermanency could continue for many more months or years, as potentially repeated appeals of permanency plan changes took time to resolve.

This is not to say that, in some instances, a stay would not be in accordance with the child's best interest. We agree with Jayden that "[t]he best interests of the child demand flexibility" and refuse to issue a rule that would fail to take into consideration the circumstances of a particular child. Whether a stay would be in a child's best interest depends on a given case.

## B.   The Stay of TPR Proceedings in This Case

The juvenile court denied the Mother's motion to stay TPR proceedings. At oral argument, Jayden posited that the juvenile court believed it had no choice but to deny the Mother's motion to stay in order to comply with the 180–day provision under FL § 5–319.

_____

kinds of orders proceed on an expedited basis." *In re Damon M.*, 362 Md. 429, 438, 765 A.2d 624, 629 (2001).

"When a court must exercise discretion, failure to do so is error, and ordinarily requires reversal." *Maus v. State,* 311 Md. 85, 108, 532 A.2d 1066, 1077 (1987) (citation omitted). There is a distinction, however, "between an explicit abdication of discretionary responsibility and the very different circumstance wherein a judge makes the required ruling but simply does so 'without setting forth any reasoning.' " *Smith v. Johns Hopkins Cmty. Physicians, Inc.,* 209 Md.App. 406, 425, 59 A.3d 1070, 1081 (2013) (quoting *Greater Metro. Orthopaedics, P.A. v. Ward,* 147 Md.App. 686, 699, 810 A.2d 534, 542 (2002)). In that event, "[t]he exercise of a judge's discretion is presumed to be correct, he is presumed to know the law, and is presumed to have performed his duties properly." *Id.* (emphasis removed) (citation omitted).

In the record before us, we do not find any evidence that would shed light on the juvenile court's thought process in denying the Mother's motion to stay. Accordingly, we presume the court exercised the discretion and found that a stay of the TPR proceedings was not in Jayden's best interests. Under the abuse of discretion standard of review, we will only disturb a court's ruling if it "does not logically follow from the findings upon which it supposedly rests or has no reasonable relationship to its announced objective." *King v. State,* 407 Md. 682, 697, 967 A.2d 790, 799 (2009) (quoting *North v. North,* 102 Md.App. 1, 13, 648 A.2d 1025, 1031 (1994)).

### *The Motion to Stay: the Focus on the Mother*

In her motion to stay the TPR case, the Mother informed the juvenile court that she was challenging the change of the permanency plan from reunification to adoption by a non-relative in the CINA case. Citing *Rashawn H.,* she emphasized that "[t]he statutory scheme and case law recognize that the best interests of a child are served by allowing the child to maintain a meaningful and positive relationship with their parent unless the parent is found to be unfit or exceptional circumstances exist." She argued that the change of the permanency plan was not in Jayden's best interests because he "had a strong attachment to [her], his siblings, and his

paternal relatives." The Mother also contended that "she demonstrated mental health stability, and was actively and continuously engaged in treatment." Finally, she highlighted her "strong bond" with the children, maintained "through visitations."

We consider the record in a light most favorable to the prevailing party. *Sifrit v. State,* 383 Md. 77, 93, 857 A.2d 65, 74 (2004). At no time during the twenty-seven months, which Jayden spent in foster care prior to the change in the permanency plan at issue, was the Mother "actively and continuously engaged in treatment." The most she did in terms of treatment was attend the initial screening appointments with a psychiatrist and a psychologist. In fact, the Mother concedes now that she "did not comply with the requirement that she obtain psychiatric treatment and medication."

But evidence showed that the Mother needed treatment in order to be reunified with the children. The examining psychologist "noted that while there is an absence of severe mental illness or disordered personality functioning, it should not mean that the children are safe in [the Mother's] care." The psychologist was troubled by the Mother's "history of placing the concerns of her romantic relationship above the safety of herself and the children and limited insight she demonstrated regarding how her judgment has potentially negatively impacted the emotional development of the children." Yet, the Mother never adhered to a treatment plan, missing several scheduled appointments without rescheduling.[27] It is not surprising then that the Mother's failure to attend to her mental health needs and to distance herself and the children from the volatile relationship with the Father were viewed by the Department as "major obstacles to the plan of reunification."

The Mother's visitation history is not encouraging either. While she "started off diligent in her pursuit to be reunified

---

27. The only therapy the Mother completed was the Abused Person's Program and individual therapy sessions.

with her children," as time went on, she was not "consistent in visitation; [and] did not attend the Family Involvement Meeting regarding the children." And then, there was the abduction of the children by the Mother and the Father. After the abduction, the Mother's ability to be a responsible parent was placed into even bigger doubt.

Indeed, the Mother's efforts towards reunification were so weak that at the sixteenth month of Jayden's time in foster care, the Department wrote: "the children have now been in care for 16 months," but "[n]either [parent] has satisfactorily demonstrated that they are in a position to have the children return to live with either one of them." Four months later, in recommending a concurrent plan of reunification with the Mother and placement with a relative, the Department once again stated that "the children have now been in care for 20 months," but neither the Mother nor the Father had made meaningful progress, which would make reunification with the children likely in the near future.

Thus, it was only expected that the Department eventually recommended a permanency plan of Another Planned Permanent Living Arrangement for Daeshawn and Victoria and adoption by a non-relative for Jayden. This is how the Department explained the reasons for this recommendation:

Unfortunately, the encouraging progress that [the Mother] demonstrated over the summer in terms of setting appropriate boundaries with [the Father], demonstrating better judgment, and working cooperatively with the Department has once again deteriorated. The positive movement that [the Mother] made was quickly eroded by the [abduction] and the ensuing weeks thereafter. The Department has concerns not only about [the Mother's] behaviors but about the rapid and dramatic fashion in which these changes occurred.

As this brief overview of the Mother's reunification efforts demonstrates, the reality was far from the idealistic picture the Mother painted in her motion to stay. In truth, not even the Mother herself believed she was ready for reunification

with Jayden or the other children even twenty-seven months after they were first placed in foster care. That explains why, in her appeal before the Court of Special Appeals, the Mother did not even argue that the plan of reunification with her should have remained in place. Rather, she maintained that the juvenile court erred in ordering a permanency plan of non-relative adoption instead of placing Jayden with the Grandmother. Thus, the entire premise of the Mother's appeal was not that a plan of reunification with her was in Jayden's best interests, but that custody and guardianship by the Grandmother should have been ordered.

Yet, the motion to stay does not even mention the Grandmother. The motion made it sound as if the appeal sought a reversal back to a plan of reunification with the Mother; hence, the arguments regarding her compliance with the mental health treatment and visitation. Twenty-seven months into reunification efforts, however, these allegations were unpersuasive. The Mother's motion—with the focus on her "mental health stability" and a "strong connection with" the children—simply failed to demonstrate that there was any likelihood the Mother would succeed on appeal. And, staying TPR proceedings pending resolution of an appeal that sounded impossible to win, "would not increase the fairness of the process or the accuracy of results," or advance the child's best interests. As the Department points out, all it "would accomplish would be delay, and unnecessary delay is contrary to the child's best interests." Without any likelihood of a successful appeal, the juvenile court did not abuse its discretion in denying the motion to stay.

### The Appeal: the Focus on the Grandmother

The real reason the Mother appealed the permanency plan change and why she sought a stay of the TPR proceedings was because, in her opinion, rather than ordering a plan of adoption by a non-relative, the juvenile court should have allowed the Grandmother, "of whom the court approved as custodian of Jayden's siblings," to "take custody of him."

It should be noted that the Mother herself was probably responsible for the children not having been placed with the Grandmother when they were removed from the Mother's custody. At that time, the Department approached the Mother, seeking information on relatives with whom the children could be placed instead of foster care. The Mother insisted the children should not be placed with the Grandmother, alleging that the she tried to poison her, had a criminal record, and could not be trusted with the children because she would not prevent the Father from having contact with them.

The rest of the blame lies squarely with the Grandmother, however. From February, when the children were placed in foster care, to June 2009, she visited them only once. Then there was a time period when she accompanied the Father to the visits. But after the abduction in October 2010, for which the Department partially blamed the Grandmother, the Father's and the Grandmother's visitation with Jayden stopped. It was only in March of 2011, more than two years after the children were placed in foster care, that the Father filed a motion seeking independent visitation rights on the Grandmother's behalf.

Furthermore, it was not until nine months after Jayden was placed in foster care that the Grandmother even expressed an interest in being a placement resource. The Department initiated a home study, but after the abduction it was no longer willing to consider the Grandmother as a placement resource. Later, the Department's position changed. It initiated another home study, but at twenty months of the children being in foster care, the study was still not complete. By the Grandmother's own admission, she failed to "follow up" on that study claiming the Mother had told her that the Department was only looking at parent reunification.[28] Meanwhile, the children spent more time in foster care.

---

28. At that time, the Grandmother lived in Prince George's County. According to the Department's Report, dated September 8, 2010, "A home study of [the Grandmother] had been requested of the Prince George's County Department of Social Services (PGDSS). [The Grand-

In light of this evidence, even if the Mother had informed the juvenile court, ruling on the motion to stay, that her appeal was not about her but the Grandmother, the court would not have abused its discretion in denying the motion. The juvenile court had before it sufficient evidence to conclude that further delay was not in Jayden's best interest. Just like the Mother, the Grandmother had twenty-seven months to convince the Department and the juvenile court that she was a suitable placement resource. Yet, she failed to do that, becoming the guardian to Daeshawn and Victoria only in their twenty-seventh month in foster care. The Department viewed Jayden's situation differently: unlike Daeshawn and Victoria, who changed foster care placements, Jayden was fortunate to be cared for by the same foster family the entire twenty-seven months out of the Mother's custody. That family was willing to adopt him.

For Jayden, permanency was not an elusive concept. As Jayden emphasizes in his brief to us, he "only lived with his mother for the first sixteen (16) months of his life. When the permanency plan was changed on May 19, 2011, he had been out of his mother's care [and in his foster family's care] for twenty-seven (27) months—nine months longer than he had been in her care and sixty-three (63) percent of his life." As for the Grandmother, it was not at all clear that Jayden even had a relationship with her.[29]

Under the CINA and TPR statutory framework, the departments of social services and we, the courts, must make "[e]very reasonable effort" to ensure that every child who has found himself in foster care obtain permanency within twenty-four months of placement. CJP § 3–823(h)(3). We agree with Jayden that, in deciding whether to stay TPR proceedings, "[t]he fact-finding court must be able to address a child's

---

mother] states that she had been contacted by PGDSS but did not follow up because [the Mother] reportedly told her that the Department was just looking at reunification."

**29.** The TPR court saw "no clear evidence of the actual level of any attachment."

current circumstances in a way that will permit the child to obtain permanence in the most expeditious manner possible." The juvenile court believed that the most expeditious and certain road to permanency was proceeding with the TPR case, not waiting to see if, perhaps, one day the Grandmother would be granted custody and guardianship over him.

In the twenty-seven months that Jayden was in foster care, both the Mother and the Grandmother had their chance to give Jayden permanency. Neither provided any tangible hope of doing so. Indeed, after the first fifteen months in foster care went by, giving the Department a statutory right to move for termination of parental rights, the Department explained the delay in filing a TPR petition by the efforts to arrange for a relative placement for the children. Yet, for twenty-seven months, neither the Mother nor the Grandmother stepped up. Considering the length of time the appellate process takes, the juvenile court did not abuse its discretion in not making Jayden wait another year or more before achieving permanency.

## III.

### The Findings Underlying the TPR Ruling

■ The juvenile court terminated the Mother's parental rights, finding that doing so was in Jayden's best interests. The Mother challenges this ruling, arguing that the court improperly took into account "Jayden's prospect of being adopted by, as well as the quality of care being provided by, his current care providers." Jayden and the Department argue that there is nothing wrong with considering Jayden's attachment to his foster family because FL § 5–323 expressly speaks of the child's "emotional ties with and feelings toward" persons "who may affect the child's best interests significantly."

The Department makes an additional argument: it maintains that the Mother's contentions should not result in a reversal of the TPR because they only pertain to factors leading to a finding of exceptional circumstances. The De-

partment posits these factors have no bearing on the finding of parental unfitness, which the Mother did not challenge in her appeal. In the Department's view, "the juvenile court's finding of parental unfitness, standing alone, is sufficient to support the judgment in this case." Indeed, that was the approach taken by the Court of Special Appeals, which affirmed the termination of the Mother's parental rights without reaching the merits of this issue.

The Court of Special Appeals and the Department are mistaken. A finding of parental unfitness overcomes the parental presumption, but it does not establish that termination of parental rights is in the child's best interest. To decide whether it is, the court must still consider the statutory factors under FL § 5–323(d). We review the juvenile court's findings under the statute, and conclude that the court did not abuse its discretion in terminating the Mother's parental rights.

### Overcoming the Presumption

The juvenile court found that (1) the Mother was an unfit parent, (2) there were exceptional circumstances overcoming the presumption that the continuation of Jayden's relationship with her was in his best interests, and (3) that termination of the Mother's parental rights was in Jayden's best interests. The Mother does not challenge these findings but rather focuses on the juvenile court's findings with respect to one set of factors under FL § 5–323(d)(4)(i)–(iv), in which the court addressed Jayden's attachment to his foster parents and sister, his adjustment to the foster home, and his feelings on the severance of the relationship with the Mother.

The Court of Special Appeals concluded that these factors tend to show the absence or presence of exceptional circumstances, but have no bearing on whether a parent is unfit. In the belief that a finding of parental unfitness in and of "itself justifies termination" of parental rights, the intermediate appellate court decided it was not necessary for it to reach the merits of the Mother's argument.

The term parental unfitness (and exceptional circumstances) was added to the Maryland's TPR statute only recently. For years, the statute spoke only of the child's best interest. In *Rashawn H.*, however, we explained that beginning the analysis with the child's best interests was improper because it created the impression that the natural parents and a third party stood on the same footing. 402 Md. at 495, 937 A.2d at 188. Rather than deciding at the outset what living arrangement is in a child's best interests, courts first had to account for the "presumption of law and fact—that it is in the best interest of children to remain in the care and custody of their parents." *Id.* This could be done "by a showing that the parent is either unfit or that exceptional circumstances exist that would make the continued relationship detrimental to the child's best interest." *Id.* at 498, 937 A.2d at 190.

After this pronouncement in *Rashawn H.*, the General Assembly amended the TPR statute, codifying the parental presumption as follows: a court may only terminate parental rights after it "finds by clear and convincing evidence that [the] parent is unfit to remain in a parental relationship with the child or that exceptional circumstances exist that would make a continuation of the parental relationship detrimental to the best interests of the child such that terminating the rights of the parent is in a child's best interests." [30] FL § 5–323(b). The child's best interest language remained in the statute, however, as the ultimate consideration in TPR cases. FL § 5–323(b), (d). The statute requires courts to "give primary consideration to the health and safety of the child and consideration to all other factors needed to determine whether terminating a parent's rights is in the child's best interests." [31] FL § 5–323(d).

---

**30.** In *In re Adoption/Guardianship of Amber R.*, we noted that, if a juvenile court makes a finding that a parent is unfit, it does "not need to make any findings with respect to 'exceptional circumstances' requiring the termination of parental rights." 417 Md. 701, 718 n. 13, 12 A.3d 130, 140 n. 13 (2011).

**31.** Since the statute was amended, we have been called to examine the significance of the enumerated factors for analyzing exceptional cir-

The Court of Special Appeals erred in concluding that a finding of parental unfitness, in and of itself, justifies termination of parental rights. Such a conclusion contradicts the terms of the TPR statute and the spirit of *Rashawn H.*, which explained the need to overcome the parental presumption before—not instead of—considering the child's best interests. Under the intermediate appellate court's logic, simply overcoming the parental presumption automatically makes termination of parental rights proper. That is not so. Once the parental presumption is overcome, the juvenile court must still decide if terminating parental rights is in the child's best interests.[32] The only way to do that is to consider all of the factors enumerated in FL § 5–323(d).

### *Was TPR in Jayden's Best Interests?*

■ "In reviewing a juvenile court's decision with regard to termination of parental rights, we utilize three different but interrelated standards." *Ta'Niya*, 417 Md. at 100, 8 A.3d at 750. We review for clear error the juvenile court's factual findings, but subject to de novo review legal conclusions. *Id.* If the court's factual findings are not clearly erroneous, and legal conclusions are correct, we review the court's "ultimate conclusion" for abuse of discretion. *Id.*

---

cumstances and parental unfitness and the relationship of these two concepts to the child's best interest. In *Ta'Niya C.*, we explained that "the factors under FL Section 5–323(d) serve both as the basis for a court's finding (1) whether there are exceptional circumstances that would make a continued parental relationship detrimental to the child's best interest, and (2) whether termination of parental rights is in the child's best interest." 417 Md. at 116, 8 A.3d at 761. In *Amber R.*, we held that "the existing statutory scheme [under FL § 5–323] is appropriate in evaluating parental fitness for the purposes of terminating parental rights." 417 Md. at 723, 12 A.3d at 143.

**32.** We have emphasized in *Ta'Niya* that the parental unfitness, exceptional circumstances, and the child's best interests considerations are not "different and separate analyses." 417 Md. at 105–06, 8 A.3d at 754. The three concepts are fused together, culminating in the ultimate conclusion of whether terminating parental rights is in a given child's best interests.

### The Specific Findings

The juvenile court detailed its findings in a thirty-page opinion, addressing the statutory factors in the order in which they appear in the statute.[33] Under FL § 5–323(d)(1)(ii)— "the extent, nature, and timeliness of services offered by a local department to facilitate reunion of the child and the parent," the court discussed in detail the numerous referrals for mental health treatment, the Abused Persons Program, and parenting classes, and the Department's efforts to encourage the Mother and the Father to take advantage of those services.

In addressing "the extent to which a local department and parent have fulfilled their obligations under a social services agreement," FL § 5–323(d)(1)(iii), the court noted that there were four written agreements, which covered "domestic violence, mental health issues, housing, employment, [and] identification of relative resources and visitation." With respect to the Mother, the court found that she "complied with a number of the Department's recommendations," but "was not able to maintain any consistency on [these] core issues, and repeatedly placed herself in positions of risk. . . . Consistency, sound judgment, an understanding of boundaries, and an appreciation of her children's welfare, both inside and outside of her relationship with [the Father], have eluded her."

Next, the court considered FL § 5–323(d)(2): "the results of the parent's effort to adjust the parent's circumstances, condition, or conduct to make it in the child's best interests for the child to be returned to the parent's home." Here, the court observed that "visitation has been [the Mother's and the Father's] strongest area of compliance." But even in this area, the Mother persistently disregarded the court's order that she have no contact with the Father before, during, or immediately after visitation because of the recurring domestic

---

**33.** It began with considering the first factor, "all services offered to the parent before the child's placement," FL § 5–323(d)(1)(i), and mentioned the protective order the Mother obtained against the Father, the Father's criminal charges, and his probation.

violence incidents. And then, there was "[t]he visit culminating in the abduction [which] was, of course, a disaster."

Under the same group of factors, FL § 5–323(d)(2)(i), the court found that the Mother stayed in touch with the Department, although the interactions were not always positive. Namely, the court cited "a recurring pattern of belligerence and animosity, ... which was neither productive nor wholly understandable." After the abduction, the Mother's attitude toward the Department deteriorated even more: "She revoked all her consents allowing the Department to access information from her mental health providers, and was increasingly rude and belligerent with the social worker." [34]

As for "the existence of a parental disability that makes the parent consistently unable to care for the child's immediate and ongoing physical or psychological needs for long periods of time," FL § 5–323(d)(2)(iii), the court found that "[a]lthough both parents have mental health issues, neither of them presented to their respective evaluators with truly disabling ... diagnoses." Nevertheless, the court observed that the Mother has "exhibited very troubling symptoms, especially when the children first came into care." That was why it was "recommended ... that she continue seeing her psychiatrist and therapist, as well as enroll in the Abused Persons Program." Indeed, the court observed, the Mother's "inability to extricate herself from the cycle of violence involving [the Father] has been crippling."

Illustrative of the parents' persistent inability to reach any meaningful progress toward reunification were the court's findings under FL § 5–323(d)(2)(iv). That factor asks the court to determine "whether additional services would be likely to bring about a lasting parental adjustment so that the

---

**34.** The court noted that the next factor under FL § 5–323(d)(2)(ii), "the parent's contribution to a reasonable part of the child's care and support," was not applicable because "[t]he parents' financial status has always been an issue, ... and there may have been little in the way of consistently available funds with which to contribute to the child's support."

child could be returned to the parent within an ascertainable time." The court found that no additional services would be useful, emphasizing that Jayden had been in foster care for thirty-three months, but the Mother and the Father continued to struggle with the same issues that led to Jayden being found CINA, including "their respective unstable housing situations, their precarious financial conditions, ... their largely untreated mental health needs, and, most significantly, their recurring pattern of domestic violence." During that entire time, from early February 2009 to May 2011, "the Department has been working with the parents to effectuate some meaningful resolution of their issues, such that reunification would be viable." The court concluded: "[h]owever one calculates the appropriate time-line, it is clear to this Court that additional services would not likely result in a lasting parental adjustment such that reunification could be attained." [35]

Of particular significance, in light of the Mother's arguments, is the court's examination of the factors under FL § 5–323(d)(4). These factors concern the child's emotional well-being:

(4)(i) the child's emotional ties with and feelings toward the child's parents, the child's siblings, and others who may affect the child's best interests significantly;

(ii) the child's adjustment to:

1. community;

2. home;

3. placement; and

4. school;

---

**35.** With regard to the factors in FL § 5–323(d)(3), concerning "whether (i) the parent has abused or neglected the child," (ii) whether the child tested positive for a drug at the time of delivery, (iii) whether the parent subjected the child to chronic abuse, neglect, sexual abuse, or torture, and (iv) whether the parent has been convicted of a violent crime, the court found that when the children were found CINA, there was evidence of "the history of domestic violence between the parents and their children's awareness of this fighting."

(iii) the child's feelings about severance of the parent-child relationship; and

(iv) the likely impact of terminating parental rights on the child's well-being.

FL § 5–323(d)(4)(i)–(iv).

Here, the court first considered Jayden's "emotional ties with and feelings toward [his] parents, [his] siblings, and others who may affect [his] best interests significantly." The court found that Jayden retained an attachment to his Mother, Daeshawn, and Victoria, but also emphasized an attachment he had to his foster parents and sister. With respect to the siblings specifically, the court stated that it was "persuaded that the loss of [the foster sister] in his life will present for him a greater challenge" than the loss of Daeshawn and Victoria. Second, the court made findings with regard to Jayden's attachment to his community, home, placement, and school. Under this group of factors, the court found that Jayden has friends, with whom he goes to day care on play dates. He has adjusted well to his foster home and considers it "to be his home and family."

Next, the court looked into Jayden's "feelings about severance of the parent-child relationship." It observed that Jayden "is bonded and secure with the [foster parents], and he still has an attachment with [his biological parents]." Weighing "the loss to Jayden of his biological family against the loss of his long term foster family, the Court is convinced that his future physical and emotional health and welfare are best served by continuing to live with the [foster parents]." The court emphasized that the Mother and the Father "have not demonstrated a pattern of understanding what is in their children's best interests, so caught [up] have they been in their own turmoil and challenges."

Finally, with respect to "the likely impact of terminating parental rights on [Jayden's] well-being," the court concluded that "[t]he evidence demonstrates that termination of parental rights will allow Jayden to have permanence in the home of [his foster parents and foster sister, who] have been consistent

in their love and support for him." [36]   Applying "the clear and convincing evidentiary standard to the totality of the evidence," and "after weighing the statutory factors in light of the requisite legal presumption," the juvenile court found that it was in Jayden's best interest that the Mother's parental rights be terminated.[37]

### The Overwhelming Evidence Justifying TPR

This summary of the juvenile court's findings illustrates that there was ample evidence before the court from which to conclude that termination of the Mother's parental rights was in Jayden's best interests.  Despite the Department's reasonable efforts over a period of thirty-three months, the Mother was unable to make a meaningful adjustment in her lifestyle, failing to address her mental health needs, continuing the destructive relationship with the Father, and being unable to maintain stable employment or housing.  Indeed, the Mother herself "concedes that she was not in a position to resume custody of Jayden."

Against the backdrop of the juvenile court's methodical analysis of the statutory factors, the Mother's contentions fall flat.  Out of the numerous fact findings, the Mother only challenges the court's findings dealing with Jayden's relationship with his foster parents.  She alleges that the court "assumed that Jayden would be adopted by his foster care providers, . . . considered the effects on Jayden of not being adopted by them, and compared the life he would have with them to the life he would have with his biological family."  She claims that by making those findings, "the court went above and beyond what was required and made findings that amounted to approving of the [foster parents] as Jayden's adoptive parents."

---

**36.**  Finally, the court considered whether there was a "waiver of local department's obligation" to provide reunification efforts under FL § 5-323(d)(e) but found none.

**37.**  The court reached the same conclusion with respect to the Father.

Comparing the Mother to Jayden's foster parents (his potential adoptive parents), as if they were on equal footing, indeed, would not have been proper. Such an approach would fail to account for the "presumption that the child's best interests are served by maintaining parental rights," placing "the most disadvantaged of our adult citizens ... at greater risk of losing custody of their children than those more fortunate." *Yve S.*, 373 Md. at 571, 819 A.2d at 1042. But that was not what the juvenile court did in this case.

FL § 5–323(d)(4) requires courts to consider the child's "emotional ties" and "feelings" toward individuals "who may affect the child's best interests significantly," and the child's adjustment to community, home, placement and school. Thus, the juvenile court was required to consider Jayden's emotional attachment to his foster parents and the impact terminating parental rights would likely have on his well-being. And, that was what the court did when it found that Jayden was strongly attached to his foster parents and sister, that he adjusted well in the foster family community, that a severance of the relationship with the Mother would not have a detrimental effect on Jayden, but that it would allow him to achieve permanency.

The Mother would prefer the juvenile court to white out any positive influence the foster family has had on Jayden, but, as we have recently stated in another TPR case, "the best interests of the child do not permit the juvenile court to ignore the reality of a child's life." *Ashley S.*, 431 Md. at 724, 66 A.3d at 1049. The court is not required to disregard "the existing attachment and emotional ties and, instead, imagine what those ties might have been in an alternate world." *Id.* Rather, "the court is to assess the reality of the children's circumstances and make findings accordingly." *Id.*

The reality of Jayden's life was such that he spent thirty-three months in foster care, while the Department worked with the Mother on addressing the issues that led to Jayden's being found CINA in the first place. For thirty-three months, the Mother was not able to make any lasting changes in any

one of the problematic areas: domestic violence, mental health issues, employment, or housing. For thirty-three months, Jayden patiently waited for the Mother to get better and bring him home. But continuing to hold on to this concept of a parental relationship any longer—in the face of the Mother's persistent inability to take charge of her life—was contrary to Jayden's best interests.

Thus, in light of the evidence before it, the juvenile court did not abuse its discretion in finding that the Mother was unfit, that there were exceptional circumstances making continuation of the relationship with the Mother detrimental to Jayden, and that termination of her parental rights in his best interests.

### Conclusion

Jayden will turn six years old in September. He was found to be CINA and placed in foster care when he was sixteen months old. When, after Jayden spent twenty-seven months in foster care, the juvenile court changed his permanency plan from reunification with the Mother to adoption by a non-relative, the Mother appealed, arguing that the new plan should have been custody and guardianship by the Grandmother. While the appeal was pending, the Mother's parental rights were terminated. She argues that the TPR proceedings should have been stayed and that, in any event, the juvenile court improperly terminated her parental rights.

We reject both arguments for the same reason: the denial of the Mother's motion to stay the TPR case and the ultimate termination of the Mother's parental rights were in Jayden's best interest. Thus, we affirm the Court of Special Appeals' ruling.

**JUDGMENT OF THE COURT OF SPECIAL APPEALS AFFIRMED; COSTS TO BE PAID BY PETITIONER.**

BELL, C.J., and HARRELL, J., join in the Judgment only.